JUDGE CARTER

DOC # __16__

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**



U.S. DISTRICT COURT
FILED

JUL 10 2015

DS
S.D. OF N.Y. KL

| | |
|---|---|
| MARK ANTONVICH, on behalf of<br>The UNITED STATES OF AMERICA, | §<br>§<br>§ |
| PLAINTIFF/Relator, | §<br>§ |
| V. | §<br>§ |
| DEUTSCHE BANK SECURITIES INC.<br>CREDIT SUISSE SECURITIES (USA) LLC | §<br>§<br>§ |
| DEFENDANTS | §<br>§ |

**14 CV** CIVIL ACTION NO. _____ **946**

FILED UNDER SEAL
31 U.S.C. §§ 3730(b)
JURY TRIAL DEMANDED

2014 FEB 14  PM 1:45
S.D. OF N.Y.
FILED
U.S. DISTRICT COURT

---

### FALSE CLAIMS ACT COMPLAINT
### "QUI TAM"

---

**TO THE HONORABLE JUDGE OF SAID COURT:**

The United States of America, by and through *qui tam* Relator, Mark Antonvich, brings

this action under 31 U.S.C. §§ 3729-33 (The "False Claims Act") to recover from Deutsche Bank

Securities Inc. ("Deutsche Bank") and Credit Suisse Securities (USA) LLC ("Credit Suisse") for

all damages, penalties, and other remedies available under the False Claims Act on behalf of the

United States and himself and would show unto the Court the following:

### PARTIES

1. Relator, Mark Antonvich ("Antonvich"), is an individual and citizen of the United States

of America, residing in Houston, Texas.

2. Defendant Deutsche Bank, a Delaware corporation, is a SEC-registered primary broker

dealer and a member of, and regulated by, the New York Stock Exchange, Federal Reserve Bank

1

(RSSD ID: 1900666) and the Office of the Comptroller of the Currency, with its principal place

of business at 60 Wall Street, New York, NY 10005.

3.   Defendant Credit Suisse, a Delaware corporation, is a SEC-registered primary broker

dealer and a member of, and regulated by, the New York Stock Exchange, Federal Reserve Bank

(RSSD ID: 2983778) and the Office of the Comptroller of the Currency, with its principal place

of business at 11 Madison Avenue, New York, NY 10010.

4. Non-party Apollo Global Management LLC ("Apollo") is a Delaware limited liability

corporation with its principal place of business in New York, New York.  Affiliates of Apollo

owned over 80% of Hexion and partners of Apollo comprised a majority of Hexion's board of

directors and asserted control over its decisions on the Huntsman merger.

5. Non-party Momentive Specialty Chemicals Inc., f/k/a Hexion Specialty Chemicals, Inc.

("Hexion"), is a New Jersey corporation with its principal place of business in Columbus, Ohio.

6. Non-party Huntsman Corporation ("Huntsman") is Delaware corporation with its principal

offices located in The Woodlands, Texas.

### JURISDICTION AND VENUE

7.   This Court maintains subject matter jurisdiction over this action pursuant to 31 U.S.C.

§3732(a) (False Claims Act) and 28 U.S.C. § 1331 (Federal Question).

8. Venue is proper in this Court under 31 U.S.C. § 3732(a) because Deutsche Bank and

Credit Suisse are located in and conduct significant business in this district.

9. Antonvich is the original source of these federal claims and has direct and independent

knowledge of all publicly disclosed information that the allegations herein are based upon.

Antonvich has personally gathered the documentation and provided a substantial amount of

factual and legal analysis to substantiate the allegations herein. Additionally, he has voluntarily provided all such information to the Government prior to the filing of this action.

## INTRODUCTION

10. From the C-Suites in Frankfurt, Zurich and Manhattan in 2007 and 2008, Deutsche Bank and Credit Suisse (the "Banks") knowingly committed massive frauds, including improper accounting fraud, in connection with the failed Huntsman merger, which resulted in financial losses in the billions of dollars to Huntsman and its shareholders, along with many other parties, including Hexion and even the Banks themselves. The fraud also affected many federally insured financial institutions. The Banks and Apollo agreed to a number of undisclosed side agreements on the merger financing and thereby fraudulently induced Huntsman to sign a merger agreement with Hexion. Apollo played a central role in the merger, as the Hexion CEO, Craig Morrison, testified at the Delaware Chancery Court in 2008:

> Apollo serves in a board capacity, in the sense as a traditional board would, as well as in a business development role. They have a lot of expertise in deal making and a lot of contacts on Wall Street, so they also serve a business development role for us.

11. The undisclosed agreements with Apollo were so important to the Banks that they were agreed to and acknowledged at the highest levels of the Banks (by Brady Dugan, CEO of Credit Suisse, and Tommy Gahan, the Head of the Americas, of Deutsche Bank). In an internal memorandum from a senior Credit Suisse banker, CEO Brady Dugan was specifically prepared for his high level meeting with Apollo founding partner, Leon Black: "Credit Suisse is trusting Apollo to deliver on its commitment to Credit Suisse. Credit Suisse underwrote $7 billion dollars of the deal based on a explicit handshake that Apollo would get Credit Suisse down to $3 and a half billion within days and Apollo made a commitment to look after Credit Suisse on the bank deal pricing." "We had an explicit handshake that you will get us down and you haven't.

3

You have promised to look after us on pricing, and you haven't, and we want you to do something about it."

12. Similarly, Tommy Gahan of Deutsche Bank was briefed on the undisclosed agreements with Apollo in internal documents: "Wanted to reiterate our position on Apollo/Huntsman. This was a difficult transaction given the size of our commitment (EUR 4.1 billion) and the declining state of the market. Nevertheless, we agreed to move forward largely on the commitment you received from Josh Harris, a founding member of Apollo, to do the following (i) work with us on the covenant issue, and (ii) to use their relationships to sell us down to 15% (EUR 1.24 billion)." In Gahan's preparation briefing for his important telephone communication with Josh Harris, he was told "This is an opportunity for Josh to tell Tommy, you can trust us," and "I have let Josh know this is critical for us to move forward." Following the Gahan/Harris call, an internal bank document revealed: "And we are there on Josh's assurances to Tommy rather than the final structure alone."

13. These secret side deals greatly increased the financing costs of the deal and increased the risk that the merger would not be consummated. When the Banks balked at funding, the merger completely collapsed. When the dust settled from the merger ruble, the commitment letter and merger funding were clearly revealed as a complete fraud and sham orchestrated by the Banks.

14. The damage caused by the Banks to Huntsman and its shareholders was nearly $7 billion. Today, the damages to uncompensated Huntsman shareholders remain in the billions of dollars.

15. Hexion was severely damaged when it was sued in Texas by Huntsman, which later resulted in a settlement of one billion dollars, of which the Banks funded $325,000,000 pursuant to a loan of $351,000,000 to Hexion's parent company. Huntsman was severely damaged and never made whole, but nevertheless settled another fraud lawsuit during a civil trial in Conroe,

Texas in 2009, whereby Deutsche Bank and Credit Suisse collectively paid Huntsman $632,000,000 in cash and another $1.1 billion in seven–year loans. The Banks also paid in excess of $60,000,000 in legal fees. Huntsman shareholders did not participate financially in these settlements and remain uncompensated.

16. The Banks and their affiliates, due to their own conduct, were significantly affected by these costs, risks and reputational damage subjecting them to liability pursuant to the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"). The Banks are also liable for their fraud pursuant to the False Claims Act (31 U.S.C. §3732(a)("FCA")), and the bank (18 U.S.C. 1001, 1005 and 1344), mail (18 U.S.C. 1341) and wire fraud (18 U.S.C. 1343) statutes.

17. The fraud evidence currently is under a preservation order due to yet another on-going private civil litigation in Texas state court in Montgomery County, in which the Banks again are incurring enormous legal fees, further reputational damage, and huge financial exposure resulting from the direct claims brought by a major Huntsman shareholder: MatlinPatterson Global Opportunities Partners L.P., MatlinPatterson Global Opportunities Partners (Bermuda) L.P. and MatlinPatterson Global Opportunities Partners B, L.P. ("MatlinPatterson") v. Deutsche Bank Securities Inc. and Credit Suisse Securities (USA) LLC (Case # 09-13-00070-CV).

18. As part of the fraud Credit Suisse underwrote and purchased 57 million Huntsman shares from affiliates of MatlinPatterson in August, 2007 and then, despite being aware of the secret side deals with Apollo, immediately resold them directly and indirectly to federally insured financial institutions or their affiliates, including (e.g. Citibank (FDIC# 7213), JP Morgan Chase (FDIC# 628), Bank of America (FDIC# 3510), Bank of New York Mellon (FDIC# 636), Northern Trust (FDIC# 913), US Bank (FDIC# 6548), Wells Fargo (FDIC# 3511), Goldman

5

Sachs Bank (FDIC#33124), Barclays Bank Delaware (FDIC# 57203), UBS Bank USA (FDIC# 57565), Comerica Bank Detroit (FDIC# 983), PNC Bank (FDIC# 6384), Sun Trust Bank (FDIC# 867), RBC Bank (FDIC# 26342), Wachovia Bank (FDIC# 33869), and Fifth Third Bank (FDIC# 6672).

19. From July 12, 2007, when Apollo/Hexion signed the merger agreement and publicly announced the merger (predicated on the false financing by the Banks), until June 19, 2008 (the "Merger Agreement Fraud Period"), when Hexion announced the lawsuit against Huntsman to terminate the merger, over 490 million shares of Huntsman were traded.   For example, Citibank (FDIC# 7213), JP Morgan Chase (FDIC# 628), Goldman Sachs (FDIC#33124), UBS (FDIC# 57565) each traded millions of Huntsman shares during the Merger Agreement Fraud Period. These financial institutions were unaware of the fraudulent merger financing (and the risk to the merger) and therefore were affected by the Bank's fraud.  This is made abundantly clear by the fact that the day after the Hexion lawsuit to terminate the merger was announced the Huntsman shares traded down sharply from $20.86 to $12.86, a huge drop of nearly forty percent (40%) in one day, on a massive dump of over 42 million shares.

20. In addition, the fraudulent conduct by Deutsche Bank officials negatively affected Deutsche Bank Trust Company Americas ("DBTCA"), an FDIC-insured bank licensed in the State of New York (FDIC# 623) and Deutsche Bank Trust Company Delaware ("DBTCD"), an FDIC-insured bank licensed in the State of Delaware (FDIC# 26392).  These insured banks are under common control by virtue of being 100% owned by the same parent entity in Germany, Deutsche Bank Aktiengesellschaft ("Deutsche Bank AG"). In fact, the evidence demonstrates that both the German parent, Deutsche Bank AG and its wholly owned subsidiary based in New York were completely engaged at the most senior level in the fraudulent activities, the risk and

liability of which "affected" federally insured DBTCA (FDIC# 623) and DBTCD (FDIC# 26392). Moreover, Deutsche Bank had an $8 billion revolving note and cash subordination agreement with DBTCD, of which $6.7 was drawn as of December 31, 2008 and 2009.

21. There are many other federally insured financial institutions that were affected by Huntsman merger fraud. Both Huntsman and Hexion had billions of dollars of publicly traded bank loans and bond indebtedness. In Hexion's case, JP Morgan Chase (FDIC# 628) was the lead bank for its senior credit facility and the remainder of that loan facility was syndicated to other federally insured financial institutions. During the fraud period and thereafter, the value of these loans decreased dramatically, as both Hexion and Huntsman teetered on insolvency due to the fraud litigation and credit crisis. In fact, Apollo took advantage of the situation and purchased hundreds of millions of the debt at a mere fraction of its face value. In addition, JPMorgan Chase Bank (FDIC# 628), as Trustee for First Plaza Group Trust (GM), held equity in Hexion's parent company, as did affiliates of Goldman Sachs (FDIC# 33124). The Wilmington Trust Company (FDIC# 34069) acted as the Trustee for the Hexion bondholders.

22. Another federally insured financial institution was also affected by the Huntsman merger fraud: Lehman Brothers Bank, FSB (FDIC #: 30890). Lehman owned 20% of D.E. Shaw, which itself lost over 400 million dollars on its Huntsman investment. There were a number of other large hedge funds that lost multi-millions due to the fraud, including Citadel and Pentwater, which undoubtedly also had federally insured financial institutions as investors. These investors are among those Huntsman shareholders whom collectively lost billions of dollars due to the fraud but were never compensated in the Huntsman settlements with Hexion and the Banks.

23. In addition to violating FIRREA and its underlying predicate statutes, the Banks violated the FCA. It is a violation of the FCA to provide a false certification to any entity of the federal

government. The Federal Financial Institutions Examination Council ("FFIEC") was established on March 10, 1979, pursuant to title X of the Financial Institutions Regulatory and Interest Rate Control Act of 1978 ("FIRA"), Public Law 95-630. FFIEC is a formal interagency body empowered to prescribe uniform principles, standards, and report forms for the federal examination of financial institutions by the Board of Governors of the Federal Reserve System ("FRB"), the Federal Deposit Insurance Corporation ("FDIC"), the National Credit Union Administration ("NCUA"), the Office of the Comptroller of the Currency ("OCC"), and the Consumer Financial Protection Bureau ("CFPB") and to make recommendations to promote uniformity in the supervision of financial institutions.

24. The FFIEC requires various reports from financial institutions, including Reporting Form FFIEC 002, Report of Assets and Liabilities of U.S. Branches and Agencies of Foreign Banks. This includes Deutsche Bank and Credit Suisse. FFIEC Report 002 is mandated by the International Banking Act ("IBA") of 1978. It collects balance sheet and off-balance-sheet information, including detailed supporting schedule items, from all U.S. branches and agencies of foreign banks. Federal supervisory agencies use this quarterly report for on-site examinations and for the analysis of the operations of foreign banks in the United States. Recognizing the need for federal regulation and supervision of foreign banking entities, Congress passed the IBA, which authorized federal supervisory agencies, under the auspices of FFIEC, to issue a report of condition of foreign banks in the United States, which relies on Form FFIEC 002. Form FFIEC 002 must be signed by an authorized officer and attested by the senior executive officer with the following certification:

> I do hereby declare that this Report of Assets and Liabilities (including the supporting schedules and supplement) has been prepared in conformance with the instructions issued by the Federal Financial Institutions Examination Council and is true to the best of my knowledge and belief.

25. As noted below, the expert witness in the Huntsman litigation in Texas testified that he reviewed the financial statements of the Banks during the fraud period in 2007 and 2008 and concluded that both banks improperly marked-to-market the commitment letter losses by billions of dollars.  This improper accounting would grossly overstate the Banks assets in the FFIEC 002 certified reports filed by the Banks during the same period.  This accounting fraud would also distort materially the Banks' ultimate parent entities quarterly and annual filings to the SEC in Forms 6K and 20F.

26. The Banks also filed annual Form X-17A-5 reports with the SEC and certified them as true and correct from 2007 through 2009. There is no mention whatsoever of the multi-billion dollar Huntsman litigation in these reports and the significant and material contingent liabilities related thereto—even after the Banks settled the lawsuit for $1.7 billion in June 2009.  The assets reported by the Banks in these reports were distorted materially because of the improper mark-to-market of the commitment letters.

27. Thus, Deutsche Bank and Credit Suisse both violated the FCA by providing these false certifications and financial statements to entities of the federal government, including the FRB, SEC, OCC and the FFIEC.  While repeatedly providing the false financial reports and certifications, Deutsche Bank and Credit Suisse, as authorized primary dealers with special access to the FRB, obtained money and U.S. Treasury securities in the billions of dollars directly from the FRB's Open Market Operations and various lending facilities to fund their operations and also to pay the settlements referenced above, along with the $100,000,000 break fee to terminate the Basell merger referenced below. The FRB, OCC, SEC and FFIEC essentially grant the Banks and their affiliates a license to operate in the United States and they rely on the integrity of their financial statements to do so. The FRB has a number of supervisory and regulatory responsibilities,

9

including the supervision and regulation of the U.S. activities of foreign banks and their affiliates,

such as Deutsche Bank and Credit Suisse. As a federal agency, the FRB takes formal enforcement

actions against U.S. agencies of foreign banks for violations of laws, rules, or regulations, unsafe

or unsound practices, breaches of fiduciary duty, and violations of final orders. Formal

enforcement actions include cease and desist orders, written agreements, removal and prohibition

orders, and orders assessing civil money penalties. Under sections 7(e) and 10(b) of the IBA (12

U.S.C. 3105(d), 3107(b), the FRB may order a foreign bank to terminate the activities of its

representative office, state branch, state agency, or commercial lending company subsidiary if the

FRB finds that:

> (A) There is reasonable cause to believe that the foreign bank, or any of its affiliates, has
> committed a violation of law or engaged in an unsafe or unsound banking practice in the
> United States; and

> (B) As a result of such violation or practice, the continued operation of the foreign bank's
> representative office, state branch, state agency, or commercial lending company subsidiary
> would not be consistent with the public interest, or with the purposes of the IBA, the BHC Act,
> or the FDIA.

The SEC and OCC have similar regulatory authority to revoke the Banks' licenses to operate in

the United States.

### THE BACKGROUND: HUNTSMAN DID NOT TRUST APOLLO

28. In late 2005, Apollo sought to purchase Huntsman to merge it with its portfolio company,

Hexion, to create what would be the world's largest specialty chemical company.

29. In February 2006, that deal fell through at the last minute because Josh Harris of Apollo

lowered the purchase price by several hundred million dollars the night before the scheduled

announcement of the deal. The Huntsman family shareholders were furious and Jon Huntsman

immediately terminated any further discussions with Josh Harris and Apollo.

30. In the spring of 2007, another private equity firm, Blackstone, made a $25 per share bid for Huntsman.  The Huntsman Board of Directors, exercising its fiduciary duty to shareholders, then created an auction process to allow other bidders to bid to ensure the Huntsman shareholders were getting the best deal possible.

31. By June of 2007, Basell and Apollo were the final two bidders. On June 25, 2007, despite getting a higher price from Apollo, the Huntsman Board chose the Basell deal, in large part because of its distrust of Apollo, for reneging at the last minute on the deal in 2006. Huntsman signed the merger agreement with Basell, which had a contractually permitted out for Huntsman if a superior offer emerged.

32. That very night, desperate to win the deal back, Apollo offered another several hundred million more dollars, and the Huntsman Board was then obligated in its fiduciary capacity to determine if the Apollo offer could lead to a deal superior to the signed Basell deal.  Apollo was extremely eager to buy Huntsman at almost any cost because it believed the merger with Hexion would create a "bellwether" specialty chemical company that would be a "must own" in the specialty chemical space.  As a result, Apollo was willing to agree to very onerous terms in the merger agreement and commitment letters it negotiated on behalf of Hexion.

**THE BANKS' FINANCING 100% OF THE WRITTEN DEAL WAS PARAMOUNT**

33. For the next several weeks, the Huntsman Board's Transaction Committee held negotiations with Apollo and its bankers, Deutsche Bank and Credit Suisse.  Because the Huntsman Board did not trust Apollo (who was not itself a party to the merger agreement and therefore would not be on the financial risk) or Hexion (its weak balance sheet was insufficient to cover contractual damages if it backed out of the deal), Huntsman insisted that the Banks fund 100% of the required merger financing in the amount of $15,350,000,000 (i.e., " fully financed")

on extremely tight terms (e.g., no material adverse change ("MAC") out for the Banks, a cap on interest rates and other agreed conditions on the financing).

34. Because Apollo significantly raised the price, which Basell would not even attempt to match, and due to the negotiated stricter terms of the commitment letters from the Banks it then trusted (particularly Deutsche Bank which had a 15-year history as its primary bank), the Huntsman Transaction Committee, in its fiduciary capacity to shareholders, found that Apollo had made a superior proposal, which was then accepted by the Huntsman Board.

35. On July 12, 2007, Huntsman legally terminated the merger agreement with Basell, by paying a $200 million termination fee ($100 million of which was funded by Hexion via a loan by the Banks). Huntsman then entered into the merger agreement with Hexion.  Apollo, on behalf of Hexion, and the Banks agreed in the final and binding commitment letters dated July 11, 2007, that the transaction was, at least on paper, "fully financed" in accordance with the total dollar amount and strict terms as expressly set forth in the written commitment letters, which also provided no out if the Banks could not syndicate all or any portion the loans.  The Banks, on paper, assumed 100% of the syndication risk. The Banks and credit market participants already knew in June and July, 2007 that the credit markets were weakening significantly, which is exactly why the Banks insisted on the following secret side deals from Apollo before signing the commitment letters:

(1)     a credit for asset sales ($653 million),

(2)     a credit for the Basell termination fee ($100 million),

(3)     the restoration of a MAC that was taken out of the commitment letters (Apollo would not waive the MAC in the merger agreement without the Banks' consent; Credit Suisse used this to take a 25% discount on its mark-to-market losses),

12

(4)    an adjustment to the interest rate cap of 25 basis points,

(5)    the addition of a debt coverage ratio covenant,

(6)    the $308 million deficit in funding (resulting from the price increase to $28 per share and 8% ticking fee) and

(7)    the syndication obligation assumed by Apollo (to get Deutsche Bank down from 50% to 15% and Credit Suisse down from 50% to 35%).

36. Apollo leaned extremely heavily on the Banks to get the financing in place and the merger agreement signed; the Banks, given the rapidly deteriorating credit markets, would soon lean heavily on Apollo to completely restructure the merger or terminate it altogether.

## REVELATION OF THE MERGER FINANCING FRAUD

37. Meanwhile, despite Apollo's assistance on the side deals and its futile attempts to bring in other investors, the Banks were not able to syndicate the loans at all as they had hoped (the credit crisis actually began prior to June, 2007 and went much faster and deeper than anticipated), and both banks consequently were exposed to multi-billion dollar losses (a risk the Banks assumed contractually), which were required by law to be recorded in the Banks' financial statements and reported publicly.  These losses also negatively impacted the Banks' regulatory capital reserve requirements during the credit crisis, but by not properly disclosing the losses, these particular banks avoided having to put in additional capital or take humiliating government bailouts.

38. The Banks demanded and received in secret from Apollo the side deals to improve the merger financing.  When that did not help the syndication, the Banks in September of 2007 proposed and in April of 2008 demanded a complete restructuring of the merger.  Even after Apollo, the Huntsman Family and several large shareholders (D.E. Shaw, Citadel and

MatlinPatterson) offered in October of 2008 to restructure the financing by putting in over $2 billion of additional funds, including obtaining a solvency opinion from an expert solvency firm, the Banks refused to attend the closing and fund the deal as contractually required. D.E. Shaw, Citadel and MatlinPatterson collectively would lose more than $1 billion of their investors' money, including federally insured financial institutions and governmental pension funds, due to the fraud.

39. The evidence (including many incriminating emails and other documents) proves that the fraudulent merger financing was perpetrated and acknowledged at the very highest levels of Deutsche Bank and Credit Suisse. The Banks saved over $10 billion by not funding the merger.

40. The conduct of Credit Suisse was particularly egregious because it purchased almost 57 million shares directly from Huntsman shareholder MatlinPatterson in August of 2007 (as permitted by the merger agreement) and immediately resold them that month to other banks and unsuspecting investors, knowing full well that the merger was not "fully financed" and that there were numerous side deals that materially changed the financing risk.

**FIRREA, FCA, SECURITIES AND BANKING FRAUD BY DEUTSCHE BANK AND CREDIT SUISSE**

41. Both Deutsche Bank and Credit Suisse violated FCA, FIRREA, banking and securities laws by illegally marking-to-market the fair value of the commitment letters at values billions of dollars above the actual market value (the credit crisis immediately and severely reduced the actual market value of the loans). Deutsche Bank's highest level of mark-to-market commitment letter losses was recorded at only $536 million, and Credit Suisse's highest level was recorded at $1,034 billion. From the very beginning, these numbers were understated, at a minimum, by $125 million for each bank, as both banks took a credit for the combined $250 million deal fees that were not yet earned and would be split 50/50 only if the deal closed. It would get much,

much worse for the Banks.  The Banks also took up front a credit for the nearly $1 billion in

anticipated sales of assets and insurance proceeds by Huntsman that was improper because,

despite paying down the debt with these proceeds, the net debt of Huntsman actually increased

due to rapidly rising raw material costs (so there was not a cash cushion as the Banks anticipated

and hoped but did not materialize).

### BY EARLY 2008, BOTH BANKS ENTIRELY STOPPED MARKING-TO-MARKET ANY ADDITIONAL LOSSES ON THE COMMITMENT LETTERS EVEN AS THE CREDIT MARKETS DECLINED MUCH FURTHER

42.  Yet, internal emails from Deutsche Bank in April 2008 between senior bank officials noted that

the commitment letter losses were increasing but were not being recorded in the financial statements

or reported to the SEC and banking regulators in the U.S. or Germany.  These additional losses

were enormous and eventually exceeded $8,295,000,000, according to the expert witness at the

Conroe, Texas trial (the numbers were likely much larger because the expert used Credit Suisse

data for the losses that was understated).  Deutsche Bank mismarked the losses by at least

$3,611,000,000.  Credit Suisse mismarked the losses by at least $3,113,000,000.  Again, officials

at the highest levels of the Banks were involved in the improper conduct (at the Group Executive

Committee of Deutsche Bank and at the Capital Allocation and Risk Management Committee of

Credit Suisse).

## MARK-TO-MARKET LOSSES BASED ON EXPERT TESTIMONY USING CREDIT SUISSE NUMBERS

| Date | Fair Value | Actual Losses* | Reported Losses | Mismarked |
|---|---|---|---|---|
| July 12, 2007 | $15,350,000,000 | 0 | N/A | |
| September 2007 | $14,870,000,000 | $480,000,000 | $230,000,000 | $250,000,000 |
| January 2008 | $14,035,000,000 | $1,315,000,000 | $1,065,000,000 | $250,000,000 |
| April 2008 | $13,496,000,000 | $1,854,000,000 | $1,570,000,000 | $284,000,000 |
| September 2008 | $10,190,000,000 | $4,910,000,000 | $1,570,000,000 | $3,340,000,000 |
| October 2008 | $6,805,000,000 | $8,545,000,000 | $1,570,000,000 | $6,975,000,000 |

*The Actual Losses include the $250 million transaction fee to the numbers set forth in the expert witness testimony of Quentin Mimms, which the Banks improperly took as a credit to reduce their losses.

43. The Banks also took over $650 million as a credit for asset sales that never materialized because, despite Huntsman paying down its debt from the sale of assets and insurance proceeds, the rapidly rising raw material costs in 2007-2008 completely wiped out that benefit, the financial result being an actual increase in the Huntsman debt. When one takes out the improper credit for asset sales, insurance proceeds, and the transaction fees, the losses are much larger, as noted in the chart below.

**MARK-TO-MARKET LOSSES WITHOUT CREDITS**

| Date | Fair Value | "Losses" | Reported Losses | Mismarked |
|------|-----------|----------|-----------------|-----------|
| July 12, 2007 | $15,350,000,000 | 0 | N/A | $900,000,000 |
| September 2007 | $14,870,000,000 | $480,000,000 | $230,000,000 | $1,380,000,000 |
| January 2008 | $14,035,000,000 | $1,315,000,000 | $1,065,000,000 | $2,215,000,000 |
| April 2008 | $13,496,000,000 | $1,854,000,000 | $1,570,000,000 | $2,754,000,000 |
| September 2008 | $10,190,000,000 | $4,910,000,000 | $1,570,000,000 | $5,810,000,000 |
| October 2008 | $6,805,000,000 | $8,545,000,000 | $1,570,000,000 | $9,445,000,000 |

44. The magnitude of the Banks' losses could never be accounted for by the side deals with Apollo. This is an important point because, despite vociferous denials by the Banks at the Huntsman trial, the reality was there were, in fact, undisclosed side agreements that materially varied the terms of the commitment letters, which formed the basis for the fraudulent inducement of Huntsman into the merger. But those side deals alone were not sufficient to cover the huge commitment letter losses because the credit market declined so quickly and deeply, which was completely outside the realm of what Apollo and the Banks contemplated. No other banks were willing to join the syndication, so the Banks held the loans 50/50 and incurred the mark-to-market losses on that basis, rather than being sold down to 15/35 as "promised" by Apollo.

45. The mark-to-market accounting fraud was clearly material to the Banks' individual financial statements, as well as on a consolidated basis with their German and Swiss parent companies. See SEC Staff Accounting Bulletin: No. 99 – Materiality, SECURITIES AND

EXCHANGE COMMISSION, 17 CFR Part 211, [Release No. SAB 99], Staff Accounting Bulletin No. 99. See also, Interagency Guidance on Certain Loans Held for Sale, March 26, 2001.

## FACTS ON MERGER TRANSACTION

### A. Apollo Seeks to Acquire Huntsman in 2007 but loses to Basell

46. In May 2007, Huntsman received an unsolicited letter from a third party proposing to acquire Huntsman at a price of $24 per share, subject to due diligence and obtaining committed financing. Huntsman contacted several other parties to determine whether anyone else would be willing to offer a higher price. In response to these inquiries, on May 18, 2007, Huntsman received a preliminary written offer from Hexion, Apollo's portfolio company, offering to pay $25 per share to acquire Huntsman.

47. As a result of the competing bids, Huntsman created a Transaction Committee to oversee the evaluation process related to the acquisition proposals. Huntsman and the Transaction Committee retained legal and financial advisors to assist in the process.

48. In early June 2007, Huntsman entered into confidentiality agreements with Hexion, Basell, and a third company to allow them to begin due diligence. During June 2007, Huntsman management met separately with the management and financial and legal advisers of each potential bidder in Montgomery County, Texas, and presented each potential bidder with a draft merger agreement and access to an electronic data room. Representatives of Deutsche Bank and Credit Suisse traveled to Texas and attended these due diligence meetings.

49. On June 12, 2007, Apollo submitted a formal written offer for Hexion to purchase Huntsman in a cash merger at a price of $25 per share.

50. On June 16, 2007 Apollo submitted its initial financing commitments to Huntsman.  The ability to fully finance the deal was very important for Huntsman, its Board of Directors, and its shareholders.  Indeed, Peter Huntsman later testified about the importance of a fully financed commitment letter by the Banks: "the risk of this transaction is the funding and that's where the vast majority of the risk is.  If it's in the funding and you have tight commitment letters and you have the banks, they're fully committed and they're standing behind a deal that is 100 percent financed by the banks that is rock solid, that should give the board some comfort."

51. Unknown to Huntsman, the Banks already were seeking to vary the terms of the Commitment Letter in side deals that would increase the financing costs and decrease their risk on the deal.  Deutsche Bank orchestrated an important telephone call between senior banking official, Tommy Gahan, Head of the Americas, and Josh Harris, founding partner of Apollo, and Gahan reported the conversation to his deal colleagues: "I spoke to him tonight and he said all of the right things.  Trust us.  We won't leave you hung.  We've priced the deal through the caps in the past.  We gave Credit Suisse the same assurances.  And they are fine."  Numerous similar email communications between the Banks and Apollo reveal the undisclosed side agreements in detail.

52. Thereafter, Huntsman representatives informed Apollo that the Transaction Committee would meet on June 25, 2007, to evaluate further the offer from Apollo and the June 22, 2007 initial offer from Basell, that Apollo's current offer of $25 per share was unlikely to result in Huntsman's Transaction Committee recommending that the company accept Apollo's proposal, and that Apollo should submit its best and final offer.

53. On the afternoon of June 25, 2007, Apollo submitted a revised offer on behalf of Hexion to purchase Huntsman at $26 per share.  On the same afternoon, Basell submitted a final

proposed merger agreement and committed financing by its bank to purchase Huntsman, in cash, at a price of $25.25 per share.

54. Later on June 25, Huntsman's board of directors met to consider the terms, conditions, and risks associated with the merger proposals of Basell and Apollo. Both management and the principal shareholders expressed the view that the Basell transaction, although nominally at a lower price, represented the better alternative of the two proposals because the Basell proposal had lower financing and regulatory risks and could be consummated more quickly.

55. After considering the proposed terms of the competing proposals, the Transaction Committee unanimously resolved to recommend that the Huntsman board of directors approve the Basell proposal. Thereafter, the full Huntsman board approved the Basell merger agreement and recommended that Huntsman's shareholders adopt the agreement. That evening, Huntsman and Basell entered into a definitive merger agreement. The deal was announced to the public the next morning, on June 26, 2007. Under the terms of the deal, Huntsman shareholders would receive $25.25 per share of Huntsman stock.

## B. The Banks and Apollo Persuade Huntsman to Terminate the Basell Merger and Enter into a Merger Agreement with Hexion

56. The Banks had a substantial interest in ensuring Apollo succeeded in its effort to acquire Huntsman—the Banks stood to make hundreds of millions of dollars of financing fees. The Banks also understood that they had no relationship with Basell for purposes of the deal, and would be excluded from enormous financing fees if Basell won the right to acquire Huntsman.

57. Soon after Huntsman entered into a merger agreement with Basell, Apollo increased its proposal to a price of $27.25 per share. On June 29, 2007, Apollo also provided Huntsman and its board with a Commitment Letter from the Banks, dated June 28, 2007, that represented that the Banks had committed to provide 100% funding for the $27.25 per share bid. Indeed, Credit

Suisse and Deutsche Bank each committed to provide "50% of the principal amount" for the entire $15.35 billion necessary to fund the deal.

58. Because Huntsman's board had a fiduciary duty to consider any bid likely to result in a superior value to its shareholders, it considered the new offer. What led Huntsman to accept Basell's proposal in the first instance was the greater certainty that it could be closed in a shorter timeframe and the rock-solid financing for the deal. Therefore, in subsequent negotiations, a critical issue was the purportedly firm commitment of the Banks to fund it on the terms presented to Huntsman. To satisfy this concern, the Banks agreed in the Commitment Letter that there would be no syndication "out"—meaning that although they had the right to try to syndicate (*i.e.*, sell) the merger debt to other financial institutions or investors, a successful syndication of the merger debt was not a condition to the Banks' obligation to fund the full committed amount at closing. If the Banks could not syndicate the debt, or could sell it only at a loss to themselves, they and they alone bore the risk of that loss. The Banks intended for and knew that Huntsman's board would receive, review, and rely on the Commitment Letter in deciding whether to reject the previously agreed-to Basell merger and pursue the Hexion transaction.

59. Because the Banks intended to syndicate the merger debt, applicable accounting and bank capitalization rules required them to record on a current basis, in their financial records, a "mark-to-market" value of the likely price at which they would be able to sell the merger debt at closing. The Banks were aware that the credit markets could tighten, in which case investors would demand a higher return on their debt investments. The interest rates in the Commitment Letter, however, were capped at specified maximum rates. The only way to create higher return that would sell in the market, therefore, would be to reduce the price at which the debt is sold. The fact that this reduction would be necessary at closing would require the Banks to record

current, mark-to-market losses in their financials on a regular basis even though the merger was not scheduled to close for many months. Sometimes called "syndication losses," these mark-to-market losses were a reflection of the present value of the future loss the Banks expected to sustain if they were required to honor their commitment and fund the merger at closing. The Commitment Letter expressly provided that the Banks alone would assume the risk of all such syndication losses.

60. The reality, however, was that the Commitment Letter was not viewed by the Banks as the "real" deal. Rather, they intended to act upon an entirely different business understanding that rendered illusory the representations that adequate funding existed to close the transaction and operate the combined entities, and that the Banks alone bore the risk of syndication losses. This understanding served to increase the financing costs while protecting the Banks from losses—a win for the Banks and a loss for all other parties. For example, internal Credit Suisse documents indicate that it agreed to the Commitment Letter "based on an explicit handshake that Apollo would get Credit Suisse down from $7 billion to $3 and a half billion within days and Apollo made a commitment to look after Credit Suisse on the bank deal pricing." And Deutsche Bank's internal documents reflect that it "agreed to move forward largely on the commitment . . . received from Josh Harris, a founding member of Apollo, to . . . work with us on the covenant issue, and . . . to use their relationships to sell us down to 15%." Such documents are consistent with a Texas Court of Appeals' conclusion in a prior proceeding that there was evidence that "the Banks and Apollo had an undisclosed agreement from the outset to vary from the terms of the commitment letter."

**C. The Banks' Representations That the Deal Was Fully Financed Was Especially
Likely to Induce Huntsman's Reliance**

61.  Persuading Huntsman to agree to abandon the Basell deal in favor of the riskier Hexion transaction was crucial to the Banks' success.  This was achieved through the Banks purported commitment to fully finance the transaction, intentionally inducing Huntsman to believe in the quality of the committed financing, and thus the high likelihood that the deal would close.

62. Huntsman was especially likely to rely on the statements regarding the financing commitments of the Banks, and the Banks intended that they do so.

### D. Apollo Makes Concessions to the Banks

63. Under the guise of rock-solid financing commitments, the Banks lured an unsuspecting Huntsman to consent to sell the company to Hexion, premised upon financing that was represented to be air tight, with no material adverse event "outs," minimal financial covenants, and an express assumption by the Banks of syndication risk.  All of these ostensible terms served to assure Huntsman that committed financing sufficient to close the merger transaction would be available, regardless of the condition of the credit markets.

64. Unknown to Huntsman, the Banks *would not* bear syndication losses in the transaction, regardless of what the Commitment Letter said or required.  Instead, the Banks required Apollo to make concessions to insulate the Banks from the very syndication losses they had agreed to assume.  In reality, the concessions were material changes in the terms of the Commitment Letter, extracted by secret assurances, which fundamentally altered the probability that the merger would close and making the terms of the transaction less appealing to Apollo and the merged entity.

65. The Banks also required assurances from Apollo that the Banks would sustain no loss on the financing commitment, regardless of the terms of the Commitment Letter.  The sole purpose of these assurances was to eliminate the syndication losses the Banks stood to sustain if they

were actually required to provide financing on the terms they had agreed to provide it.  The result of these understandings was to perpetrate a profound fraud on Huntsman on a matter critical to the decision of whether to move forward with a transaction with Hexion—namely, whether the terms of the financing proffered in support of that bid were real, or illusory, and whether the commitment was rock solid, or instead was shifting sand on which the transaction would fall apart at the first storm in the credit markets.

### E. The Secret "Business Understanding" About the Financing

66. Huntsman was unaware of the scheme by the Banks to manipulate financing terms, and equally unaware of the Banks intention not to perform under the Commitment Letter as promised.

67. The existence of a firm, rock solid commitment letter was highly material to Huntsman's decision about which bid to accept.  The Banks represented to Huntsman that theirs was a solid commitment letter, with no undisclosed conditions.  This gave Huntsman the certainty that, in a transaction with a long lead time, the Banks would be there, with the money, when it came time to close the transaction.

68. The combined entity to be created by the proposed merger would be highly leveraged; it was therefore essential to Huntsman's decision that the combined entity would be certifiable as solvent—and thus entitled to draw down all of the committed funding.  To assure Huntsman that this was the case, the Commitment Letter contained detailed provisions purporting to describe the terms of the committed financing.  These ostensibly "firm" terms included descriptions of tranches of debt, interest rate caps (which specified the maximum interest rate that could be charged), and the absence of any debt coverage covenants.

69. The existence of these definitive terms—and the lack of any covenants imposing other limitations on the use of funds—were highly material to Huntsman.  In its August 10, 2007 preliminary proxy and September 12, 2007, definitive proxy statement, Huntsman explained that one of the reasons the Transaction Committee supported the Hexion transaction was "the nature of Hexion's financing commitments received with respect to the merger, including the identity of the institutions providing such commitments, the limited conditions to the obligations of such institutions to fund such commitments, including the absence of a material adverse effect provision and the duration of such commitments."

70. But the Banks knew that these commitments were highly illusory.  Indeed, the Banks knew that Huntsman was in the process of divesting its base chemicals and polymers business, and that the sale of those assets was expected to generate nearly a billion dollars in proceeds.  In addition to the proceeds from the sale of those businesses, the Banks knew that any merger with Hexion would require the divestiture of additional assets, and would therefore generate even more cash proceeds.  The signed Commitment Letter did not state that the proceeds of any of those asset sales would reduce the funding available under the Commitment Letter; to the contrary, the letter stated that the full amount of the committed funding would be available to be drawn at closing.

71. The Banks, however, secretly had required that the proceeds of the nearly $1 billion of asset sales and divestitures would be "credited" against the committed financing in the form of a reduction in the amount that could be drawn on the financing.  In other words, if divestitures occurred, the Banks expected to have the benefit of those proceeds and reduce the funding available under the Commitment Letter.  This secret business understanding ensured that the committed financing was actually worth nearly $1 billion less than the Banks had represented to

Huntsman.  It also increased the financing costs and ratcheted up the risk of shortfall in the amount required to close the transaction—decreasing the attractiveness of the deal to all but the Banks.  The Banks did not tell Huntsman about their secret agreement, or the increased risk of shortfall at closing.  The testimony of several senior bank officials confirmed this credit for asset sales and the Banks reduced their mark-to-market losses on this basis.  In the Texas trial, Huntsman's financial expert testified: "So what that is indicating that they -- that Deutsche Bank is not performing their calculations strictly based on what is reflected in the commitment letter, but they are adjusting those calculations to reflect the side agreement that they have with Apollo. . . .  Well, that the -- the agreement, as indicated in this document and in other documents, was that Apollo would make changes to the commitment in order to reduce the losses that the bank would have to -- to protect the banks."  "Deutsche Bank did not record any additional mark-to-market losses after January 2008. . . .  As reflected on this schedule and in other documents, because of their agreement with Apollo, they did not change.  They did not reflect the additional mark-to-market losses."  The financial expert in his testimony described the basis for one internal bank document which accounted for a reduction from $15,350,000,000 to $14,697,000,000 in total committed funds:  "Well, the -- the testimony by Mr. O'Hara, a senior Credit Suisse person, indicated that they had reduced that amount to reflect items such as the sale of assets and other similar proceeds.  So they have reduced the amount that they assume that they would fund."

72. The Banks also knew that the terms of the committed financing were not the "real" terms. Before the Commitment Letter was signed, the Banks knew that the capped interest rates were illusory.  The Banks fully intended to adjust them to insulate themselves from syndication losses, regardless of the assurances made that the interest rates were capped.  Chris Owen of Deutsche

Bank wrote: "Everyone is nervous about the market.  Epley and Cole were on with Josh for a while, lots of F-bombs were dropped.  Credit Suisse only raised caps 25 basis points, plus Josh's word, they would not lose money."  In short, the Banks understanding before the Commitment Letter was even signed was that the capped interest rates would be modified and the Banks would not lose money.

73. The Banks also agreed to be flexible about financial covenants in the financing, and might impose them to protect themselves, again without regard to the fact that the Banks had represented that there were, and would be, no such covenants.  Internal bank documents repeatedly reflect the secret agreement to protect the Banks through undisclosed covenants.  As one email from the Banks stated: "To this point, I've been trusting our relationship with Apollo to get us an extra rate or a covenant and have had an explicit conversation on that point."  Another email responded: "This is where we have ended up" and documented the four changes that the Banks and Apollo have agreed to, including "a willingness to work with us on the covenant issue in the event that market is challenging.  The deal team feels very good about these changes and assurances."

74. Also among the secret assurances and agreements the Banks extracted, never disclosed to Huntsman, was a promise that Apollo would "work with them" as "partners" on the financing, prior to closing the merger, in order to:

- insulate the Banks from market losses on the debt, despite the express representation that the Banks had assumed and would bear all such syndication losses;

- cure violations of internal lending limits created by the financing commitment, which the Banks believed exceeded what they were authorized to fund;

- ensure that the Banks did not have to "write the full check" at closing of the merger, because the Banks knew that neither one of them, nor both of them together, had the financial wherewithal, capital, or permissible lending limits to permit them to do so.  As noted by a high-level Deutsche Bank official who actually signed the

Commitment Letter: "Do we know how they want to deal with the fact that neither us, nor Credit Suisse nor both of us combined, can underwrite the entire check?"  This is the same person that, upon learning that Apollo was not putting in equity on July 12, 2007, the date of the merger agreement, stated to her Deutsche Bank colleagues:  "We are doomed."

75. All of these secret side agreements changed the purportedly firm, committed, $15.35 billion financing described in the Commitment Letter.  When Huntsman, its board, and its shareholders accepted Apollo's bid for the merger with Hexion, it was entirely unaware of these side agreements.

76. Also unknown to Huntsman was the fact that the Banks did not believe they could fund the full amount covered by the Commitment Letter because it was in excess of their internal lending limits and risk management policies.  Indeed, one day before Huntsman accepted Hexion's bid, a Deutsche Bank employee emailed a colleague that the proposed merger agreement contains a financial breach section that would allow the Banks to be sued if they do not honor their commitment.  The colleague's response was "I think they should just sue us now."  In other words, the Banks knew from the outset that they could not fulfill their obligations under the Commitment Letter.

77. Huntsman would never have agreed to abandon the Basell deal in favor of a Hexion merger had they known the Banks' oral and written representations were false.

### F.  The False Representations of Committed Funding and the Financing Deficit Created by an Increased Bid

78. After Apollo's bid increased to $27.25, Huntsman notified Basell that it had received a revised proposal from Apollo.  On July 5, 2007, Basell delivered a letter to Huntsman arguing that the Basell merger agreement was superior to the Apollo offer because, in part, it had less completion risk.

79. In order to further persuade Huntsman to terminate the Basell merger, Apollo increased its proposal to a price of $28 per share, plus a "ticking fee" payable if the merger did not close by April 5, 2008. Apollo also agreed to cause Hexion to fund $100 million of the $200 million breakup fee that would be due Basell if Huntsman relinquished its contract with Basell.

80. These additions to Apollo's bid only made matters worse with regard to the committed financing. The Banks knew that Hexion was not going to fund its portion of the breakup fee with its own cash because it was strapped for cash. Instead, the financing for that amount would come from the Banks. This meant that an additional $100 million of the committed financing would be unavailable to the combined entity post-closing.

81. Additionally, when Apollo increased its offer to $28 per share, the Banks recognized that this created an "implied equity" commitment on the part of Apollo, because the price increase was not matched by a commensurate increase in the committed financing. This meant that the $28 per share offer could not be fully funded by the Banks because the Banks had never agreed, and would not agree, to provide that much funding. As a Deutsche Bank senior credit official testified, the price increase meant that the amount of consideration to be paid exceeded by $250 million the amount of committed debt:

A: I heard that the price was raised to 28. To my knowledge, there was no discussion of the source of that incremental money.

Q: And from and after that point through to the date the commitment letter was signed, were you asked to extend additional debt to cover that $250 million price increase?

A: No, I don't believe so. No.

Q: And you did not, in fact, extend additional debt to cover that $250 million price increase?

A: No, we didn't.

Q: And, so, as of the time the merger agreement was signed with Huntsman, the committed financing was, in your mind, arithmetically $250 million less than the consideration required to close the merger?

A: If what you're asking is was there a gap -- since they were paying more money, was there a gap? Yes.

82. When the $200 million ticking fee was added to the $28 per share price, the implied equity that would have to be funded by Apollo at closing had risen to $308 million. In other words, when the merger agreement was signed, the amount of consideration to be paid exceeded the amount of the committed debt.

83. The Banks never disclosed the material fact that they believed the increased price and 8% ticking fee created an unfunded gap that would have to be filled with a significant equity contribution from Apollo. Rather, the Banks never intended to perform the Commitment Letter as represented; instead, they viewed the Commitment Letter as little more than a piece of paper containing flexible targets that would be changed to suit their interests regardless of its effects.

84. Additionally, in order to induce Huntsman—and its MatlinPatterson board members—to relinquish its contract with Basell, the Banks agreed to remove the material adverse change ("MAC") from the Commitment Letter so that they could not unilaterally declare a MAC and terminate the financing on the basis of changed circumstances.

85. What the Banks did not tell Huntsman, was that they agreed to remove the MAC based on their requirement that Apollo not waive its MAC without the Bank's consent. A series of internal bank emails noted: "Malcolm, if we are able to agree to Wingspan's language in the MAC, which is that if Apollo waives the MAC, we have no say and have to fund. David Muletta would like for you to have the conversation with Apollo, that they would not do that without our consent." "Agreed. Told them the third-party language is a nonstarter and that are agreeing to

the MAC change would depend on getting a specific verbal understanding from Josh that Apollo would not waive the MAC."

86. When asked whether Huntsman was aware of the Banks side agreement on the MAC, Peter Huntsman testified: "Absolutely not. Absolutely not."

### G. Huntsman Relinquishes its Contract with Basell

87. As a result of the false representations made by the Banks, the Transaction Committee and the Huntsman board concluded that the revised Hexion offer was superior to the Basell transaction. Accordingly, on July 12, 2007, Huntsman terminated the Basell merger agreement and paid the $200 million termination fee to Basell, of which Hexion—and secretly financed by the Banks—funded $100 million. On the same day, Huntsman issued a press release from Texas announcing the signing the merger agreement with Hexion. The press release states: "The transaction is not subject to a financing condition and commitments have been obtained by Hexion for all necessary debt financing from affiliates of Credit Suisse and Deutsche Bank AG." Despite having actual knowledge that Huntsman had just unwittingly made a material misrepresentation, the Banks did not correct this misstatement.

### H. The Banks Know the Merger Is Not Fully Funded

88. On September 20, 2007, Credit Suisse met with Apollo to remind it that the increase in the bid price to $28 per share had created a $308 million equity gap in the funding required to close. Credit Suisse also told Apollo that the structure of the financing needed to be changed in order to make it acceptable to the market. In addition to the implied equity requirement, Credit Suisse recommended Apollo agree to include a debt covenant in the financing, even though one was not included in the Commitment Letter. This covenant would have caused the company to go into default if it breached a certain ratio of earnings to debt—a covenant that would make the

merger less attractive. Credit Suisse also reminded Apollo of the undisclosed agreement that asset sales were to reduce, dollar for dollar, the funding to be drawn from the loan. The discussion with Credit Suisse during this meeting reflected that $900 million less would be made available under the committed financing than had been represented. As noted by Huntsman's financial expert: "Less than a month after the commitment letter was signed, the banks had found that there were no takers, no one willing to come in and accept a portion of this debt."

### I. The Deal Falls Apart

89. In April 2008, the Banks again met with Apollo to express their concerns about financing. By now, the implied equity commitment had ballooned to $785 million. Moreover, the credit markets had turned substantially against the Banks, and they now faced substantial mark-to-market losses on their committed financing. So the Banks made the extraordinary demand that Apollo/Hexion abandon the merger entirely and proceed with a different transaction that would require billions less in funding from the Banks. In fact, Deutsche Bank stopped reporting its mark-to-market losses in 2008 on the basis that it had the undisclosed side deals with Apollo, in which Apollo promised Deutsche Bank that it would not lose money on the financing. Huntsman's financial expert testified in the Texas litigation that the mark-to-market losses for the Banks were $230 million as of September 2007; $1.065 billion as of January 24, 2008; $1.604 billion as of April 2008; $4.910 billion as of September 2008; and $8.295 billion as of October 30, 2008, the scheduled closing date of the merger. It is instructive to read the testimony of the expert witness to understand the magnitude of the Banks' mark-to-market commitment letter losses:

### DIRECT EXAMINATION OF EXPERT WITNESS - QUENTIN MIMMS

JUDGE EDWARDS: Please be seated. I apologize for the delay this morning. This is not your fault, solely mine. This is a typical Monday morning where everything goes wrong

and in exactly the right order, starting with getting up. So I wanna -- call in your next witness.

MS. PATRICK: Huntsman Corporation calls Quentin Mimms.

JUDGE EDWARDS: Mr. Mimms, could you come over here.
Raise your right hand. Do you swear to tell the truth, in this matter, so help you God?

MR. MIMMS: I do.

JUDGE EDWARDS: All right. Be seated.

MS. PATRICK: May it please the Court. I'll question from the lectern this morning?
JUDGE EDWARDS: That's fine.

MS. PATRICK: Good morning. Would you introduce yourself to the jury, please?
MR. MIMMS: Yes. My name is Quentin Mimms.

MS. PATRICK: Where do you live, Mr. Mimms?
MR. MIMMS: I live in Dallas, Texas, in Dallas area.

MS. PATRICK: What do you do for work?
MR. MIMMS: I work for a consulting firm by the name of Alvarez & Marsal and -- and the work that I do with them is really forensic accounting and in consulting on [inaudible] matters.

MS. PATRICK: Are you a certified public accountant?
MR. MIMMS: Yes, I am. I -- I'm a CPA.

MS. PATRICK: How long have you been a CPA?
MR. MIMMS: For 25 years.

MS. PATRICK: And let's give the jury a sense of your education, please.
MR. MIMMS: Sure. I have a Master in Business Administration, an MBA, from Rice University and I have an undergraduate degree in accounting from Lubbock Christian University.

MS. PATRICK: You're from Dallas?
MR. MIMMS: That area.

MS. PATRICK: And would you give the jury a sense of what your experience has been in matters of valuation of contracts and securities, things like that?
MR. MIMMS: Sure. I have worked on a number of matters where the work that I am doing is valuing either individual assets or contracts or debt securities or companies as a whole. So a significant amount of the work that I've done over the last 25 years has involved valuation issues.

MS. PATRICK: And did I ask you to come here to give us the benefit of your knowledge and experience about mark-to-market accounting?

MR. MIMMS: Yes, you did.

MS. PATRICK: And in that regard, have you reviewed some of the banks' internal mark-to-market records?

MR. MIMMS: Yes, I have.

MS. PATRICK: Are they here on the -- the table here in two separate binders?

MR. MIMMS: Yes. At least, that would be part of the documents I reviewed, yes.

MS. PATRICK: Now, the jury has heard a lot about the terms "mark-to-market accounting" and "mark-to-market losses." So before we begin, let's talk about what mark-to-market accounting is.

MR. MIMMS: Sure.

MS. PATRICK: And if we could first put up S-1, please? I would be -- if it's easier Mr. Mimms, you can look here or you can look behind you at the -- at the slide.

MR. MIMMS: Oh there -- it should be [inaudible] if you like. It's okay.

MS. PATRICK: That -- that would be [inaudible].

MR. MIMMS: So many. Okay. Thank you.

MS. PATRICK: So this is a slide that has the definition of fair value. Why did you think this would be a helpful thing for us to know?

MR. MIMMS: Well, this particular chart actually is a -- I believe a good summary of fair value taken from the accounting rules that -- that are the types of rules that companies must follow that issue financial statements -- public financial statements. So I believe this is a good summary of fair value.

MS. PATRICK: And why are there rules that require companies to account for these things in the same way?

MR. MIMMS: Well, for -- and -- and you might expect there are variety of companies that are in the total range of industries with different types of businesses that are required to issue financial statements, and the rules are put in place so that investors and other users of the financial statements can read and see those financial statements with some consistency. So the purpose of those rules are so that the investors and readers can understand and can see what those published companies operate even though they are different businesses and different industries. So it's for consistency.

MS. PATRICK: So, as a financial matter, it makes it easy to compare apples to apples. Is that fair?

MR. MIMMS: Correct. Yes.

MS. PATRICK: Let's talk a little bit about the standards that apply to mark-to-market accounting and how mark-to-market accounting is done. Can we have S-2, please? What is this, Mr. Mimms?

MR. MIMMS: Yes. This particular chart, again, is identifying some of the points from the rules that the companies and the accountants must follow. And -- and starting off, the first bullet point there is the basic guideline that companies will perform their valuation calculations, working at transactions that were not forced. In other words, not a fire sale or an unusual transaction but working at ordinary transactions between willing buyers and willing sellers; the -- the rules that we just looked at on the prior chart for United States GAAP and for international reporting purposes, those were talked about transactions between willing buyers and willing sellers. So, that's a keen point is that it's not a forced transaction.

MS. PATRICK: Now, what about the second bullet point that you have here. "Valuation techniques are used to measure fair value." What is that about?

MR. MIMMS: Yes. The -- the rules also talk about and provide guidance that basically is saying use existing normal techniques that businesses and companies and those that are [inaudible] in their valuing assets and liabilities that they use in a whole variety of circumstances. In other words, the -- the accounting rules that would make new rules on how to determine the value, they say use normal techniques so that the rules are simply to provide consistency in how it's done but use regular techniques to do so.

MS. PATRICK: Now, you have noted there that one of the inputs to valuation are prices in active markets. Why does mark-to-market accounting look at prices out in the marketplace?

MR. MIMMS: Well, even as the name would indicate, one of the key pieces of information is what are the prices that individuals or companies will buy and sell those assets or liabilities. So the first and best indicator of value is what would someone pay for it, what is the transaction price out in the marketplace. So that is one of the key places to look, first and foremost, if there is -- if there are transactions for the identical security or identical loan or identical asset look to those. If there aren't transactions for identical assets, the next bullet says, "Look to similar assets." Similar type of -- of debt or similar type of bond will note, look for similar assets.

MS. PATRICK: Now, I -- I think we are all familiar with the New York Stock Exchange and the stock market. Are you saying that there are market prices for financing documents, financing deals?

MR. MIMMS: Yes, there are. They're -- they are a little bit different than what you think going into your newspaper, go online and look at, but there are similar prices and says that there are transactions everyday for those debt securities [inaudible].

MS. PATRICK: Now, the rest that you have there is "Gains and losses are reported in the earnings." What is that about?

MR. MIMMS: The rules also indicate that these gains or losses that are calculated in various points in time should be reflected in the income statement or the financial statements of the companies. So, in other words, the points for this mark-to-market

accounting is to actually reflect those gains or losses in the financial statements that are produced and prepared by the companies.

MS. PATRICK: Well, I thought these were just paper losses, Mr. Mimms?
MR. MIMMS: Well, they're not just paper losses, they're very real losses that are occurring in the marketplace because they're reflective of transactions, they're reflective of the value of those assets as time passes.

MS. PATRICK: All right. I wanna look at a couple of examples just to be sure that -- that I've got it right. Let's start with a -- sale -- a share of stock, all right?
MR. MIMMS: Sure.

MS. PATRICK: All right. So about two years ago Exxon stock was trading for a hundred and [inaudible] that [inaudible] math in high school. We're gonna be using similar numbers, for Christ sake. Let's assume we buy one share of Exxon at $100. [inaudible] so far?
MR. MIMMS: Yes.

MS. PATRICK: Now, what happens if the price of Exxon stock goes down to $75 a share?
MR. MIMMS: Well, now -- now, the value of that stock, that share of stock, is $75. So there's been a loss of $25 in that -- in the value of that stock.

MS. PATRICK: But I didn't sell it, I still own it. Why do I have a loss?
MR. MIMMS: You still have a loss because that is the value of the stock. That is the amount that you could actually sell that one share of stock today, $75 you have a loss of $25.

MS. PATRICK: And if I were accounting for the stock sale on a mark-to-market basis, what would happen to my income?
MR. MIMMS: That $25 loss would be reported as a loss of $25 on your income statement.

MS. PATRICK: Thank you. Let's look at how this might work in a retirement account. Have you given us an example of that, Mr. Mimms?
MR. MIMMS: Yes, I have.

MS. PATRICK: Okay. Would you turn to -- put up S-4, please. And your Honor, can Mr. Mimms step down to the screen to explain this to us, this exhibit, please?
JUDGE EDWARDS: Yes.

MS. PATRICK: What is this example that you have prepared, Mr. Mimms?
MR. MIMMS: Yes. This particular chart is a summary or reflection of what you would typically have if you have a retirement account, 401K account, for instance, at -- at your company is -- is -- and this is a typical statement that a 401K statement would look like. And, for instance, what you see here in this particular summary is it is reflecting the

[inaudible] time period showing that the beginning value of the account was $50,000. It also shows that there -- that the ending balance is 25,000 for a loss of $25,000 here in the course of that year. So at the end of that time period, the rate of return or the loss is 50 percent of the original value [inaudible] to be 50 with loss of 25,000 with the ending balance at the end of the year of $25,000. So, that's what we talk [inaudible] shows. And then you have additional detail down at the bottom part of this chart.

MS. PATRICK: Now, what is -- I -- I see that -- that you have price sets for these three hypothetical mutual funds A, B, and C that were, as of December 31, 2001 and then as of December 31, 2008, and those prices have changed. What is the significance of that for this example that you've given us?

MR. MIMMS: Correct. The -- the change of the price from the end of 2007 to the end of 2008 is essentially looking at the market price at those three points in time, and that is essentially marking-to-market, that's a mark-to-market determination. So this share price, first, it's a mutual fund [inaudible] example of $8 that went to seven. That, essentially, is showing that the market price changed $1. So, that mark-to-market calculation which is essentially all of what this calculation is, if marking to market, the mutual fund shares that are held in this retirement account. From the example, first, as you see that there are no changes in the shares. So the only change that has occurred is the share price in of those seven [inaudible].

MS. PATRICK: And so, that's a mark-to-market loss in -- in this retirement statement that you've given us here.

MR. MIMMS: That is correct.

MS. PATRICK: All right. You can take your seat. How did you observe this happening in the banks' accounting records for the financing commitment they made to fund the merger of Huntsman and Hexion? Is it different?

MR. MIMMS: Well, it's -- in fundamental calculation, it's not any different. It is essentially the same process as is reflected in -- in the chart that I just used. For each piece of the -- of the loan -- the loan commitment, the banks would determine what the value was, what the price to sell that loan would be at the current time as compared to the prior time period, and that is the marking-to-market I did. So it's essentially the same process.

MS. PATRICK: Do we have that piece from opening statement? Could you put that up? Can you pull up for the jury? This is a piece from the opening statement of the banks' counsel, Mr. Clary, about these mark-to-market losses. And Mr. Clary says, "If you don't plan to actually provide the financing, you don't have to record the loss. They've recorded the loss because they expected to make the financing." I want to ask you some questions about that. You can put that down. When you reviewed the banks' mark-to-market records, what do they reflect about whether the banks recorded their mark-to-market losses in a way that was consistent with funding the full amount of the commitment letter?

MR. MIMMS: There are numerous instances they are very clearly reflecting that they -- the banks did not expect to fund the full amount of the commitment letter.

36

MS. PATRICK: Let's look at some of those. Can we first look at Plaintiff's Exhibit 1175, page 1? Now, this is mighty tiny. And can you just - - Mike, the -- the little blocks that says total commitment, could you put that up for us, please? That's fine. What is Plaintiff's Exhibit 1175, Mr. Mimms?

MR. MIMMS: Well, you can see in the -- top left hand corner there that say -- indicates MTM commitments. So, that is mark-to-market. So, this is one of the calculations of -- by Credit Suisse of their mark-to-market calculation for accounting purposes.

MS. PATRICK: And what was the total amount of the commitment reflected in the commitment letter? Remind us about it, please.

MR. MIMMS: The total amount for both banks was $15,350,000,000.

MS. PATRICK: And what is the total commitment amount that Credit Suisse is reflecting here?

MR. MIMMS: If you look down in that -- the total about halfway down the page is $14,697,000,000.

MS. PATRICK: Right there at the bottom of the total commitments?

MR. MIMMS: Correct. That one that was just highlighted in yellow.

MS. PATRICK: $14,697,000,000?

MR. MIMMS: Correct.

MS. PATRICK: Why is it different, Mr. Mimms?

MR. MIMMS: Well, the -- the testimony by Mr. O'Hara, a senior Credit Suisse person, indicated that they had reduced that amount to reflect items such as the sale of assets and other similar proceeds. So they have reduced the amount that they assume that they would fund.

MS. PATRICK: So they reduced the commitment amount in their mark-to-market records to reflect an expectation that they would get credit for asset sales?

MR. MIMMS: Correct.

MS. PATRICK: Was that in the commitment letter?

MR. MIMMS: No, it was not.

MS. PATRICK: Let's look at Plaintiff's Exhibit 64, page 5. This is a leverage finance portfolio review there from Credit Suisse as you can see underneath it. And again, what is the total commitment amount there?

MR. MIMMS: And this was a [inaudible] is 14,697,000,000, same amount with what we just looked at.

MS. PATRICK: And -- and why did Mr. O'Hara said that they reflected that smaller amount?

MR. MIMMS: It did, again, reflected a reduction to their commitment for asset sales and other similar adjustments.

MS. PATRICK: Reflected in the commitment letter?
MR. MIMMS: Not at all.

MS. PATRICK: Let's look at Deutsche Bank, Plaintiff's Exhibit 2452.
What is Plaintiff's Exhibit 2452, Mr. Mimms?
MR. MIMMS: This particular schedule is what is referred to as a CRM analysis. That's a credit -- credit risk management analysis. Essentially, this is the Deutsche Bank summary of their mark-to-market accounting losses that they were taking on their various commitments.

MS. PATRICK: I just need to see the -- the -- that you're on the -- you're not on the Hexion commitment, mister? I think I put up the wrong page. Would you get to the Hexion commitment, please?
SPEAKER: I think it's about six pages back or something.

MS. PATRICK: There you go, Huntsman, up at the top. There we go. That's my fault. And I need the text underneath it, please, Mike. There you go. All right. Sorry about that. That's not -- I lost you while I was trying to get the right document. I'm sorry.
MR. MIMMS: No problem.

MS. PATRICK: Let's -- let's start again. Plaintiff's Exhibit 2452, what is this document again?
MR. MIMMS: Yes. This is the credit risk management analysis. These are the mark-to-market accounting summaries prepared by Deutsche Bank. It summarized the losses that they are reporting in the analysis they're doing for their commitments.

MS. PATRICK: And what does it indicate about whether Deutsche Bank is recognizing losses on the commitment as the credit markets decline?
MR. MIMMS: Well, the -- the language below the table there, you see indicates that the valuation was determined with consideration of the binding side letter with the -- with the sponsor, Apollo. So what that is indicating that they -- that Deutsche Bank is not performing their calculations strictly based on what is reflected in the commitment letter, but they are adjusting those calculations to reflect the side agreement that they have with Apollo.

MS. PATRICK: So they aren't recording losses because of an agreement with Apollo?
MR. MIMMS: That is correct.

MS. PATRICK: What did you, from their documents, understand they believed the agreement was?
MR. MIMMS: Well, that the -- the agreement, as indicated in this document and in other documents, was that Apollo would make changes to the commitment in order to reduce the losses that the bank would have to -- to protect the banks.

MS. PATRICK: Is this just a one-time document, Mr. Mimms, somebody kind of got out of line and wrote this down one time? Is that the only time you see that in <u>Deutsche Bank's</u> documents?

MR. MIMMS: No, I see it every time as well.

MS. PATRICK: Let's look at Plaintiff's Exhibit 2453. Can you show me this same piece from that? What -- is this another one of the documents that you reviewed, Mr. Mimms?

MR. MIMMS: Yes, it is.

MS. PATRICK: And what does it indicate about whether in reducing their recognized mark-to-market losses, Deutsche Bank was giving a fact to some understanding with Apollo?

MR. MIMMS: It's as you can see in this particular paragraph, this underneath the table, it's on the screen. And the table indicates that the valuation considered verbal and written communication with the sponsor, Apollo. Again, if you saw the first page as the exhibit was put up, this was as of March 31, 2008, the prior exhibit that we looked at was as of December 31, 2007. So at the next quarter end, they have the same language or similar language about their agreement with Apollo in -- in those calculations to padding your account.

MS. PATRICK: And, Mr. Mimms, just tell us for the jury, [inaudible] after January of 2008, were the credit markets declining?

MR. MIMMS: The credit markets were declining very consistently and significantly after January 2008, yes.

MS. PATRICK: And -- and what was Deutsche Bank doing with -- would that have caused the recognition of mark-to-market losses by Deutsche Bank in the ordinary course?

MR. MIMMS: It would have, yes.

MS. PATRICK: Did it?

MR. MIMMS: Deutsche Bank did not record any additional mark-to-market losses after January 2008. They have the same amount they placed through the duration of -- of the commitment letter at that point.

MS. PATRICK: And what was the reason they recorded in their own records for not recognizing additional mark-to-market losses?

MR. MIMMS: As reflected on this schedule and in other documents, because of their agreement with Apollo, they did not change. They did not reflect the additional mark-to-market losses.

MS. PATRICK: Let's take that down. In the course of the work that you did, Mr. Mimms, did you also review some written policies that the banks have concerning how they would recognize and record their mark-to-market losses?

MR. MIMMS: I did. Yes.

MS. PATRICK: I want to look at Credit Suisse's policies and see what they tell us about whether the banks were reporting -- or the Credit Suisse was reporting losses because it expected to fund in accordance with the commitment letter. Okay?
MR. MIMMS: Okay.

MS. PATRICK: Can I please -- Plaintiff's Exhibit 1068, page 189. Okay. What is this document, Mr. Mimms?
MR. MIMMS: This particular document is a slide prepared by Credit Suisse that summarizes their loan commitment marketing process. You see it in the title there. This is the summary of their internal guidelines, their policies for their mark-to- market calculations.

MS. PATRICK: And one of their categories there they start with an estimated market price on the left, is that right?
MR. MIMMS: Correct.

MS. PATRICK: As you've explained to us, that's one of the inputs for valuation, right?
MR. MIMMS: Yes.

MS. PATRICK: And then, if you move over, probability waiting, do you see that?
MR. MIMMS: I do.

MS. PATRICK: How does Credit Suisse use a probability waiting in assessing its mark-to-market losses as you understood it from their policies?
MR. MIMMS: After Credit Suisse calculates the total amount that they expect that the sale with the price of those securities -- the total loss, it would -- would be incurred, they then multiply that by a percentage -- a probability or a -- a percentage -- a factor to adjust that down to the actual amount that they record as the mark-to-market accounting loss.

MS. PATRICK: And did they have certain definitions of what applies at particular percentages as they account for it in their records?
MR. MIMMS: They do. That's what is in the -- from the bottom right hand quadrant of this chart.

MS. PATRICK: And Mike, could you do me a favor? Would you make a bigger picture of what it says on the 75 percent? The 75 percent probability for Credit Suisse, according to their policies, is [inaudible] that applies when a material adverse change clause still exists. Right?
MR. MIMMS: Correct. That's what the policy says.

MS. PATRICK: Was there a material adverse change clause in this commitment letter?
MR. MIMMS: There was not.

MS. PATRICK: Why not?

MR. MIMMS: It was negotiated out by Huntsman at the time of their commitment letter back in 2007.

MS. PATRICK: Well, why, then, is Credit Suisse recording the mark-to-market expectation on this commitment at a probability that applies when a material adverse change clause exist?
MR. MIMMS: I don't have an explanation for that.

MS. PATRICK: All right. Now, while we're on the topic of probabilities, tell the jury, what was the highest probability that Credit Suisse ever assigned to the likelihood that it would fund this commitment?
MR. MIMMS: The 75 percent was the highest that they ever assigned to their calculation.

MS. PATRICK: And after Apollo filed suit in June of 2008, what did Credit Suisse do to the probability?
MR. MIMMS: Credit Suisse reduced the probability to 25 percent.

MS. PATRICK: And Mike, can you pull that down so we can see the 25 percent?
And at 25 percent, the probability is enough information to expect a material change in terms resulting in exposure reduction for Credit Suisse including restructuring discussions. Is that right?
MR. MIMMS: Correct.

MS. PATRICK: Now, even after Huntsman won the lawsuit in Delaware in September of 2008, did that **probability change**?
MR. MIMMS: No. Credit Suisse left the percentage at 25 percent.

MS. PATRICK: And can you make it bigger so we can see what 90 and a hundred percent look like? What does Credit Suisse's probability indicate as the probability that is ordinarily assigned when a transaction is within 30 days of closing?
MR. MIMMS: Well, then, there are -- are two different percentages there, but the first of those at 95 percent is -- is indicated when -- that within 30 days of funding, and there's -- it's highly likely there are no material negotiation. So, essentially, that you're -- that they are very close to -- to the funding date.

MS. PATRICK: And what about 90 percent?
MR. MIMMS: And the 90 percent is beginning within 30 days when they are under negotiations so they expect some change, but they're very close to closing.

MS. PATRICK: And so after Huntsman won the lawsuit, and Hexion and Huntsman established a closing date of October 28, Credit Suisse kept to the public that -- that they changed the probability to 90 percent?
MR. MIMMS: No. They kept it at 25 percent.

MS. PATRICK: And what did that indicate about the likelihood that Credit Suisse, in fact, would show up and close on October 28 at the scheduled closing of the merger?

41

MR. MIMMS: It indicated a very low likelihood that they will fund.

MS. PATRICK: And -- and that was the likelihood they had assigned all the way back to June and never changed, right?
MR. MIMMS: Correct.

MS. PATRICK: You can take that down. Thank you, Mike.
What I'd like to do now is to give the jury the benefit of the actual mark-to-market losses that the banks recorded at particular points in time that they may find relevant to this case. Have you calculated the banks mark-to-market lawsuits on particular dates?
MR. MIMMS: Yes, I have.

MS. PATRICK: And how did you do that?
MR. MIMMS: Well, the process that I went through, we've talked about it, is pointing toward some voluminous documents -- documentation that the -- the banks prepared during the course of their mark-to-market calculations. And as you would expect, there is a set of documents for both banks. For Deutsche Bank, as we have talked a few moments ago, their calculations did not change after January of 2008. As a result of that -- as far as what they used with the mark-to-market accounting, as a result of that, I have focused on the Credit Suisse calculations. So the -- the mark-to-market calculations, as an example [inaudible] which we have seen, I looked at those documents, analyzed those documents for purposes of identifying the total mark-to-market loss, the total loss that the banks expected related to the Hexion-Huntsman commitment.

MS. PATRICK: Can we have chart S-9, please? Now, Mr. Mimms, this is the -- is this the chart that you prepared of the banks combined mark-to-market losses?
MR. MIMMS: It -- it is combined in the sense that you see the -- the black line that goes flat from January of 2008. That's the Deutsche Bank amount of their losses. The red bar -- the red line is the Credit Suisse calculation of their total losses. So, in that sense it's combined, but not added together but they're both on the chart.

MS. PATRICK: They're both on the chart and -- and the black line is flat because Deutsche Bank is not actually recording mark-to-market losses even as the credit markets decline?
MR. MIMMS: That is correct.

MS. PATRICK: Okay. And since both banks are responding to the same credit markets, ordinarily, should they have recorded those losses?
MR. MIMMS: You would expect that those losses to be increasing at Deutsche Bank like they were increasing at Credit Suisse.

MS. PATRICK: And so, in your opinion, if the jury wants to know the losses that were faced by both banks on particular dates, what should they do?

MR. MIMMS: In my opinion, the focus should be on the Credit Suisse numbers because they show the total calculation of what was happening in the credit markets and they are more representative of -- of the value of those loans.

MS. PATRICK: But Credit Suisse would only be half, right? So, how would you get the total?

MR. MIMMS: The Credit Suisse would only be half. But since each bank had exactly 50 percent, you can multiply that number by two, Credit Suisse number by two to get the total.

MS. PATRICK: Was Deutsche Bank just unaware that the credit markets were deteriorating?

MR. MIMMS: No. In -- in other -- our correspondents' other calculations, Deutsche Bank indicated they understood that the losses they had put would not reflect the total losses under the commitment letter. But as we talked about a few moments ago, when they get the calculation for the mark-to-market accounting, they indicated that they did not change the mark because they had the side agreement with Apollo.

MS. PATRICK: Let's look at Plaintiff's Exhibit 2352, if we can.

What is this document, Mr. Mimms?

MR. MIMMS: This particular document is a -- is an e- mail exchange in April 2008 between senior individuals within Deutsche Bank.

MS. PATRICK: Right. And can we look at page 3 of that, please, Mike? And can you blow that chart up a little bit bigger for us so we can see it? Now, let me get this a little bit out of the way. Okay. Mr. Mimms, this is from Deutsche Bank?

MR. MIMMS: Correct.

MS. PATRICK: And what is this that they are recording here at this point in this structure fees and losses analysis?

MR. MIMMS: Well, as you can there, they have a summary of the gross loss, the total loss that is reflected in the total commitment of almost $1.9 billion as compared -- what they understand the total actual loss for the commitment.

MS. PATRICK: So, Deutsche Bank, when it needed to, understood that its losses were just as big as Credit Suisse's. They just didn't report them?

MR. MIMMS: They did not report them in the -- in the accounting records. That is correct. This was prepared in preparation for a meeting with -- with Apollo. So I knew -- I knew what the condition of the credit markets were.

MS. PATRICK: Now, the banks' counsel also told the jury in opening statement that the banks had to close on the transaction to get the benefit of the commitment fee, the $250 million commitment fee. All right?

MR. MIMMS: Okay.

43

MS. PATRICK: In your review of the banks' mark- to-market records, how did they reflect the commitment fee?

MR. MIMMS: Well, the -- the banks would immediately reflect the commitment fee as part of the calculation. We actually see that in the same chart that we're looking at, the next line down from the -- $1,899,000,000 number that's highlighted there. The next line down is the -- the fees. So, for the purposes of calculating their net loss, the banks would subtract the estimated fees from the current loss position that they had with the loans. So, you see, in round numbers, the 1.9 billion and then they subtract almost 300 million, 0.3 billion, to have a net loss above $1.6 billion. So they immediately, and in -- for all times, took into account the fees that they anticipated on the loans.

MS. PATRICK: So even though they hadn't closed --

MR. MIMMS: Correct.

MS. PATRICK: -- the banks recorded the benefit of the commitment fee in their accounting records?

MR. MIMMS: It recorded them as part of their mark-to- market accounting calculation, yes.

MS. PATRICK: And of course, they would have actually received if they have shown at the closing, right?

MR. MIMMS: They had funded, yes.

MS. PATRICK: All right. Thank you, Mike. You can take that down.

The jury has also heard testimony that the banks intended to try to syndicate or sell down to other banks portions of the commitment to bring in other banks. Are you aware of that?

MR. MIMMS: You're -- I'm aware the records do so, yes.

MS. PATRICK: Were the banks able to do that?

MR. MIMMS: They were not successful in getting others to come in.

MS. PATRICK: And in theory, how would the likelihood that other banks will come in to the commitment relate to the reflection of mark-to- market losses?

MR. MIMMS: To the extent that -- that the banks were able to sell a portion of the -- of the commitment to other banks or -- or syndicate or bring other banks in on the deal and their individual exposure, the total amount that each individual bank would have would have been reduced and, therefore, the amount of their mark-to-market accounting losses would have been reduced.

MS. PATRICK: Can we have page 2244, please and -- Plaintiff's Exhibit 2244. And can you go to page 2 and 3? Mr. Mimms, in your work, did you see certain indications about the banks' efforts to bring in other banks and whether they were successful?

MR. MIMMS: Yes, I did.

MS. PATRICK: All right. I wanna look at a couple of those things. This is an e-mail, starting at the bottom, on July 19 from Liz Chang to another Deutsche Bank banker. And can you pull out over on the other side of what the e-mail says? It says, "What part are you worried about? [inaudible] and I have all had calls from other banks. No one is buying in." Do you see that?
MR. MIMMS: I do.

MS. PATRICK: Now, how does this date compare to the date of the commitment letter?
MR. MIMMS: Well, this is literally just days after the commitment letter. The commitment letter, I believe, was signed on July 11th or July 12th, so this is a week later.

MS. PATRICK: All right. And at least at this point, although the banks were trying to sell it, had they been successful?
MR. MIMMS: So far, they had no luck.

MS. PATRICK: Let's look at page 1 of that same exhibit, Plaintiff's Exhibit 2244, and look at the bottom here. And let's pull up another e-mail from Ms. Chang. She's talking here about efforts by [inaudible] to sell the commitment. And at the bottom there it says, "He basically told me to get out of their way because they were going to sell us down, no problem, and there were all these guys dying to get in until they saw our letters." Do you see that?
MR. MIMMS: I do.

MS. PATRICK: What is the significance of the reference to the letters, the commitment letter itself, as it pertained to the banks' ability to sell this down?
MR. MIMMS: Well, in -- at the point in time that a potential buyer saw the commitment letters and the terms that banks had agreed to buy the financing, the loans, no one else was interested.

MS. PATRICK: Let's look at Plaintiff's Exhibit 2245. Okay. And let's look at the bottom. This is July 20th. This is a reference to Citigroup, an e-mail from Tom Cole. Kimo, that's a reference to Kimo Esplin, said, "Citi called him today and said they were not coming in to their deal. Awful." Do you see that?
MR. MIMMS: I do.

MS. PATRICK: And now, let's look at Plaintiff's Exhibit. And I'd like you to pull out the -- the last note, just the two paragraphs there. The jury has seen this before. This is from Mr. Wade. This is August 3, 2007, and this is Mr. Wade saying that "Unfortunately, no progress has been made to date on the efforts to use -- to get them sold down." Do you see that?
MR. MIMMS: Yes.

MS. PATRICK: "As discussed, credit risk management has no appetite to hold this level of exposure for any extended period of time. Therefore, we think it's time to start pushing for a restructuring of the transaction to facilitate a slowdown." Do you see that?
MR. MIMMS: I do.

MS. PATRICK: And this is August 3rd, right?
MR. MIMMS: Correct.

MS. PATRICK: So, as you looked at the banks' mark-to-market records, what does it
indicate to you about whether the syndication had failed -- that syndication effort had
failed within weeks of the commitment letter being signed?
MR. MIMMS: Yes. Less than a month after the commitment letter was signed, the banks
had found that there were no takers, no one willing to come in and accept a portion of this
debt.

MS. PATRICK: So, without changes, they weren't gonna get any other banks in there?
MR. MIMMS: They were -- that's correct.

MS. PATRICK: Thank you. Can we put S-5A up, please? Mr. Mimms, we're gonna go
back to the Credit Suisse mark-to-market losses and start to benchmark some of these
losses. And what I'm gonna ask you to do is tell me on particular dates what the losses
were for Credit Suisse and what the losses would be for Deutsche Bank if you double
them as you indicated we should.
MR. MIMMS: Sure.

MS. PATRICK: The jury has heard a lot about a meeting and we'll hear more about
meetings in September between Credit Suisse and Deutsche Bank in which they
requested changes to the -- to the structure of the deal. Are aware of those meetings?
MR. MIMMS: Yes.

MS. PATRICK: And as of September 2007, what were the total -- what were the total
losses the banks would have sustained on funding if they funded?
MR. MIMMS: The total losses they would have sustained -- sustained was about $230
million. And we're looking at just the -- the Credit Suisse parts, so their portion of that
would have been about 115 million.

MS. PATRICK: And is that the mark-to-market loss or is that the total loss on funding?
MR. MIMMS: That would be the -- the total loss on funding.

MS. PATRICK: Okay. So, as of September, for both banks, what is the number again?
MR. MIMMS: 230 million.

MS. PATRICK: And is that -- how is the commitment fee reflected in that number?
MR. MIMMS: That is net of the commitment fee. So, that amount would be more than
$250 million higher if the commitment fee was not subtracted from it.

MS. PATRICK: All right. Let's go to S-5B, please. This is in January. And before we
look at these losses, I wanna ask you to -- this is just some testimony from David Maletta
so we can place this testimony in time. Can we see the clip of Mr. Maletta's testimony,
please?

LAWYER: I don't understand this section, page 24. It says, "Options for dealing with the leveraged finance overhang," and well, this part of this overhang was Huntsman and Hexion at this point. Right?
MR. MALETTA: Uh-huh.

LAWYER: And it was something that Credit Suisse wanted to try to deal with, true?
MR. MALETTA: Correct.

LAWYER: And so it says, "Option one, do nothing, shut down your business." What does that mean?
MR. MALETTA: When you say shut -- "do nothing," just sit on these commitments, don't do any new business so that -- so that our commitment to leveraged finance would not increase. It would be frozen at those levels.

LAWYER: So, at the $50 billion level, you told the leveraged finance group, kitty's closed guys, until you get it worked down?
MR. MALETTA: Pretty much.

LAWYER: So one of the things they're saying to you on the leveraged finance business is "If you shut us down, we will lose the opportunity for up to a billion dollars of underwriting revenue and we may lose key players because we're not competitive." Do you see that?
MR. MALETTA: That's the argument they're making.

LAWYER: We'll take our marbles and go elsewhere?
MR. MALETTA: That's the argument they're making.

LAWYER: And what was CARMC's reaction when Mr. Hunt and Mr. Newberry said we'll take our marbles and go elsewhere if you don't give us a credit?
MR. MALETTA: The message that they received from this CARMC meeting was reduce the exposure.

LAWYER: Full stop?
MR. MALETTA: Full stop.

MS. PATRICK: Now, Mr. Mimms, CARMC is a committee at Credit Suisse that allocates capital that the investment bankers can use to earn fees. All right?
MR. MIMMS: Right.

MS. PATRICK: Are you aware of that from your work?
MR. MIMMS: Yes.

MS. PATRICK: And what was the significance to the bankers of being told, no more capital unless you work the exposure down?

MR. MIMMS: Well, the significance was that they could not do any more deals that not only would they be -- are they dealing with the losses in the deals that they have in place but they can't get any more deals until they get that -- get those assets sold off and those liabilities sold off.

MS. NORTH: And, your Honor, I -- I -- excuse me, I'd like to object to this line of questioning as Mr. Mimms purporting to testify about what the intent of the banks were.

MS. PATRICK: I'll rephrase.
JUDGE EDWARDS: You need to rephrase. Thank you.

MS. PATRICK: What was the largest commitment on the books of Credit Suisse records finance department at this point in time?
MR. MIMMS: It was the Hexion-Huntsman deal.

MS. PATRICK: By how much?
MR. MIMMS: Several billion dollars.

MS. PATRICK: And the jury is gonna hear from Mr. Maletta tomorrow so we'll move on and let him explain the significance of that from his perspective. But as of this point in time in January, how large were Credit Suisse's mark-to- market losses?
MR. MIMMS: Their mark-to-market losses were in excess of $500 million -- $532 million, at this point in time.

MS. PATRICK: And -- and can we look at -- this is S- 5B. This is the -- the graph of the mark-to-market losses. And so in January, we have this CARMC meeting about which Mr. Maletta has just testified. And what else happens in January that was relevant to your mark-to-market --
MR. MIMMS: Well, there was --

MS. PATRICK: -- calculation?
MR. MIMMS: -- there was also a meeting in Davos, the Davos meeting where Credit Suisse folks met with one of the senior representatives -- founders of Apollo.

MS. PATRICK: All right. And so, as of the end of January -- January 24th there, as you have it, what were the expected losses on funding if the banks had funded the Huntsman-Hexion commitment?
MR. MIMMS: The total for the two of them would have been about 1,065,000,000.

MS. PATRICK: And Mr. Mimms, at this point, the merger hadn't happened, right?
MR. MIMMS: Correct.

MS. PATRICK: Nobody had been required to make a payment or miss one. Right?
MR. MIMMS: Correct.

MS. PATRICK: So, what's causing these mark-to- market losses?

MR. MIMMS: Well, they -- the markets -- the credit markets are deteriorating. And so the value, if you will, of those -- of that debt is decreasing to the banks or, put another way, the terms of the credit that Hexion and Huntsman had was in their favor and detrimental to the banks.

MS. PATRICK: Okay.
Now, let's go forward to April. Can we look at S- 5C, please? So we looked at September of 2007 and we looked at January of 2008. Now, let's look at April of 2008.
The jury has heard evidence, will hear more evidence about the banks' efforts to restructure this commitment. In April of 2008, can you tell them, please, what were the losses on funding that the banks would have recognized the mark-to- market losses on funding, if they had funded the commitment at that point in April of 2008?
MR. MIMMS: It would have been over $1.6 billion, $1,604,000,000, again, net of fees.

MS. PATRICK: And how does that compare to the memo that Deutsche Bank prepared that we looked at a bit earlier? Is that the same number?
MR. MIMMS: It's very, very similar. Yes.

MS. PATRICK: Let's just take a look at Plaintiff's Exhibit 2352. And can you just show me -- show us the table again? And just pull out the losses at the bottom there.
MR. MIMMS: I think it's actually --

MS. PATRICK: It's a -- sorry. [inaudible]. Thank you.
MR. MIMMS: Yes. That's the -- the 1,610,000,000 is -- is what this particular calculation had. The Credit Suisse number was almost identical with just a few million dollar difference.

MS. PATRICK: All right. Can we have S-5D, as in dog, please?
Now, after the lawsuit was filed in Delaware, the jury is gonna hear evidence. Mr. Price is gonna be here on Thursday to testify that Credit Suisse did its own solvency analysis beginning in August and there's another one in September. Are you aware of that?
MR. MIMMS: I am.

MS. PATRICK: Now, Mr. Price, in Delaware, testified that one of the purposes of this mark -- of this solvency analysis in August and another solvency analysis in September was to assist Credit Suisse in making its own mark-to-market calculations. Are you aware of that testimony?
MR. MIMMS: I'm aware of that testimony.

MS. PATRICK: What do Credit Suisse's records reflect about whether they really used that solvency analysis to calculate their mark-to-market loss in August and September?
MR. MIMMS: The records indicate that they did not use that analysis to calculate their mark-to-market loss. And the testimony of Mr. O'Hara, who was the one that performed the -- he was -- he was responsible for the mark-to-market calculations, indicated it was not used at least through September 30 for that purpose.

MS. PATRICK: So the two solvency analyses -- and let's go on and see the next slide if we can. So the two solvency analyses that Mr. Price prepared and testified to, one in August, one in September, as of September 1st, were they used for Credit Suisse's mark-to-market calculations?
MR. MIMMS: No, they were not.

MS. PATRICK: When was the first time Credit Suisse used its own internal solvency analyses to affect its mark-to-market calculation?
MR. MIMMS: Well, according to Mr. O'Hara, it would have been after September 30, 2008.
MS. PATRICK: After Huntsman won the lawsuit?
MR. MIMMS: Correct.

MS. PATRICK: When they needed to keep their losses low?
MR. MIMMS: If that would be helpful in that regard.

MS. PATRICK: And Mr. Price also testified in Delaware that the mark-to-market probability was adjusted down to 25 percent in June because of the performance of the companies. What did you conclude was the reason the probability was adjusted down to 25 percent in June?
MR. MIMMS: Well, based on my review and analysis of the documents and particularly a document where Credit Suisse identified the reasons for reducing their probability down to 25 percent, the very first item on the list was because the lawsuit had been filed.

MS. PATRICK: Is there anything in there about the performance of the companies in that document?
MR. MIMMS: Not that I recall.

MS. PATRICK: And when did they adjust it to 25 percent?
MR. MIMMS: At the very first calculation after the lawsuit was filed, late in June 2008.

MS. PATRICK: And -- and by the way, when Mr. Price was testifying in Delaware in September of 2008, how big were the banks' combined losses on funding at that point?
MR. MIMMS: As of -- I'm sorry, as of September 2008?

MS. PATRICK: Yes.
MR. MIMMS: The total losses were $4,910,000,000.

MS. PATRICK: Now, in January, Mr. Mimms, at this meeting in Davos, there is a reference to a conversation that was had between Leon Black and -- and the chief executive officer of Credit Suisse. Do you -- are you familiar with that?
MR. MIMMS: Yes.

MS. PATRICK: Can we look at Plaintiff's Exhibit 67, please?
And can you pull out the paragraph in the middle, "We reiterated twice." And can you highlight that language, "We reiterated twice" through to the end of the sentence, please.

Now, this record of the conversation in Davos records that the chief executive officer of Credit Suisse group, the chief executive officer of the Credit Suisse investment bank and Mr. [inaudible], who wrote this note, recorded that they had communicated to Leon Black, "We reiterated twice regarding Hexion-Huntsman that we needed to find a solution that would limit the damage to both firms and it was in our mutual interest." Are you familiar with this document, Mr. Mimms?
MR. MIMMS: Yes, I am.

MS. PATRICK: How was the Huntsman-Hexion commitment causing damage to Credit Suisse?
MR. MIMMS: One is it was two-fold. It was, for that particular commitment, the mark-to-market losses were -- they were largely growing, so there were losses on that particular commitment. And then secondly, as we have just seen from other documents and testimony, Credit Suisse was in a position where they were not able to do new transactions. They were not able to make new loans.

MS. NORTH: Your Honor, excuse me, I object again to Mr. Mimms' testimony here. It's outside the scope of what he has been retained to testify. He's here to testify about mark-to-market losses, not what the banks would otherwise be doing with their capital.
JUDGE EDWARDS: Sustained. Go on.

MS. PATRICK: Mr. Mimms, let's go on -- thank you, your Honor -- to the closing, and in this -- let's just stir this up. At least as it pertains to the mark-to-market losses, would those have caused damage to banks?
MR. MIMMS: The banks, of course, sustained substantial mark-to-market losses at that point in time.

MS. PATRICK: And -- and where they paper losses or where they recording those losses?
MR. MIMMS: They were recording those losses. They - - they were very real losses.

MS. PATRICK: Okay. Can we go back to S-5F, please? Now, I wanna ask you, Mr. Mimms, one question. I noticed that these meetings with the banks, September -- late September of 2007, January 24th of 2008, and mid-April of 2008, what is significant about those dates, to your opinion?
MR. MIMMS: Well, they all occur around the time that there is a quarterly recording that the banks have to make. So the banks are in -- in the time period where they are having to actually record and report as mark-to-market losses. So, having those meetings, you're just [inaudible] or as they are meeting up to the actual disclosure of their operating results.

MS. PATRICK: Now, let's look at -- I wanna look at an Exhibit 1163. How large were the banks' combined losses in October at the point when they refused to fund the merger?
MR. MIMMS: Total combined losses were $8,295,000,000.

MS. PATRICK: And can you tell us, Mr. Mimms, how did the banks benefit from termination of the merger when it inquires?

MR. MIMMS: Well, the banks benefited by, first of all, not recording and not actually having to absorb all of that $8.3 billion of loss. The banks combined were previously recorded one point -- approximately $1.6 billion of losses. They immediately were able to reverse that and take that into incomes so they were able to report profit of 1.6, and they were able to avoid the loss of an additional approximately $6.4 billion if they would have incurred, had they funded.

MS. PATRICK: Did the banks report publicly to their shareholders that they have benefitted from termination of this merger?

MR. MIMMS: They did.

MS. PATRICK: Can you look at page 1163 -- Plaintiff's Exhibit 1163, please? And this is an excerpt from Credit Suisse's presentation to its investors of its fourth quarter and full year results for 2008. And can we go, please, to page 66. Can you turn that over? This is a summary of leveraged finance exposures. Is that where the Hexion commitment was recorded in the banks' books?

MR. MIMMS: Correct.

MS. PATRICK: And -- and that second bullet point there, "Significant reduction was primarily due to the expiration of the commitment to a single borrower which accounted for over half of our exposure in third quarter '08." Do you see that?

MR. MIMMS: I do.

MS. PATRICK: What commitment was that, Mr. Mimms?

MR. MIMMS: That is the Hexion-Huntsman commitment.

MS. PATRICK: And look at page 48 of that document, please. And can you pick up that -- just that left -- leveraged finance little thing? What is this?

MR. MIMMS: This is a chart. It is showing that from the third quarter of 2007, which is the first quarter when the Hexion-Huntsman deal would have been on the books, that Credit Suisse had an exposure and leveraged finance of 59 billion, and by the fourth quarter of 2008, that had dropped all the way to 49 billion with the last significant setup from third quarter '08 to fourth quarter '09. The majority of that production is the expiration of the Hexion-Huntsman deal because the banks would not fund it.

MS. PATRICK: So this was a bigger net issue that they highlight the determination of this commitment in this report?

MR. MIMMS: They did.

MS. PATRICK: I wanna ask you now about some of Huntsman's losses and we're gonna come back to one other point on the benefit to the banks from determination of this merger. Can we look, please, at Exhibit S-8? One of the things they asked you to do, Mr. Mimms, to separate from mark-to-market losses was to quantify some of the cost and expenses Huntsman incurred as a result of the failure of its merger. Is that correct?

MR. MIMMS: Correct.

MS. PATRICK: All right. And have you prepared a summary schedule to identify what those losses [inaudible] are?
MR. MIMMS: Yes, I have.

MS. PATRICK: And would you describe for us how you went about doing that?
MR. MIMMS: Sure. This particular summary is a summary of voluminous underlying accounting records and discussions with Huntsman personnel. The three categories of expense here, first of all, the $100 million break-up fee that Huntsman paid to Basell is -- is a single entry, so that one expires.
The volume of the documents is straightforward, but the merger transaction cost and the Delaware litigation cost, those reflect a variety in the number of different law firms and vendors, for instance, on the -- the merger transaction cost. Those reflect the legal fees, the document production fees, fees that were paid to the regulators, for instance the Securities and Exchange Commission, in order to facilitate what Huntsman hoped would be the closing of -- of the merger. So, that total is $19 million of label to the failed -- the failed merger for which they got no benefit as a result of the failure to fund and close.

MS. PATRICK: And so, in total, what are the failed merger costs and expenses that Huntsman incurred as a result of the inability to close the merger with Huntsman and Hexion?
MR. MIMMS: $19 million.

MS. PATRICK: And what about the Delaware litigation costs?
MR. MIMMS: The Delaware litigation costs predominantly reflects attorneys' fees in kind of litigation costs, legal fees as well as in document discovery fees, and variety of -- of costs that are incurred -- were incurred in the Delaware litigation, and those totaled to $33 million.

MS. PATRICK: And so, in total, Mr. Mimms, including the break-up fee, the litigation costs to try to defend the merger agreement and the costs associated with trying to close the merger agreement, what are the expenses that Huntsman has incurred and lost as a result of the inability to close the merger?
MR. MIMMS: $152 million.

MS. PATRICK: Your Honor, we offer S-7 as plaintiff's exhibit next.

MS. NORTH: No objection, your Honor.
JUDGE EDWARDS: Deemed admitted.

MS. PATRICK: Now, Mr. Mimms, I wanna go and look at one more demonstrative that you have prepared for us, and can you please show me Exhibit S-6 -- S-7, I'm sorry. What have you summarized on Exhibit S-7, Mr. Mimms?
MR. MIMMS: This particular chart summarizes the mark-to-market accounting losses, that in -- in the categories, by bank that we've discussed earlier on the chart. So this

particular chart with this table reflects the specific amounts, both the Credit Suisse and Deutsche Bank, both can reverse into profit when they did not fund and the additional losses that they would have recorded had they -- they funded and closed the merger.

MS. PATRICK: So you have here profits immediately recognized as -- as a benefit to the banks for not funding of $1.57 billion. What is that?
MR. MIMMS: Those are the amounts that the banks reported as profit on their financial statements in the fourth quarter of 2008 as a result of the -- refusing to fund the -- the loans.

MS. PATRICK: And what is the significance of the $6.4 billion, Mr. Mimms?
MR. MIMMS: The $6.4 billion is the amount of the losses -- additional losses that the banks have voided because they did not fund. Had they funded and -- and funded the $15 billion that was reflected in the commitment letters, because of the status of the -- of the credit markets at the time, the banks would have recognized an additional 6.4 million loss in addition to the billion and five that we've talked about.

MS. PATRICK: So, what was the total benefit to the banks of not funding this merger at the closing in October?
MR. MIMMS: $8,002,000,000.

MS. PATRICK: Mr. Mimms, can I ask you something? Are you generally aware that Huntsman is here suing for actual damages?
MR. MIMMS: I'm aware of that, yes.

MS. PATRICK: And are you aware that the actual damages Huntsman has sought are $3.6 billion for Basell agreement and $4.6 billion for the Hexion agreement?
MR. MIMMS: Yes, I'm aware of that.

MS. PATRICK: If the banks -- if -- if the jury finds in favor of Huntsman and awards us the full amount of the actual damages, how much benefit from destroying the merger will the banks retain?
MR. MIMMS: The banks would still -- first, in favor, if the jury awarded 4.6 billion, the banks would still be better off by more than $3 billion.

MS. PATRICK: By destroying the merger, they'd be better off by how much?
MR. MIMMS: By $3.4 billion.

MS. PATRICK: Even if they pay actual damages?
MR. MIMMS: Correct.

MS. PATRICK: Thank you, Mr. Mimms. I don't have anything further.

90. In the wake of the April 2008 meeting, in a June 18, 2008, press release, Hexion publicly

disclosed—for the first time—that it did not believe financing would be available and did not

believe the transaction could be completed.  Prior to that time, neither the Banks nor Apollo/Hexion disclosed publicly any concerns about the ability to finance the transaction.  At the same time, Hexion, announced that it had commenced a lawsuit against Huntsman, the purpose of which was to try to absolve it of any liability when the transaction did not close.

91. The Banks knew that disclosure of the lack of financing would cause Huntsman's share price to drop significantly, which it did.  In fact, on June 19, 2008, Huntsman's stock price fell by nearly forty percent (40%) on huge volume selling of over 42 million shares.  And based on the lack of financing and the high financing costs created from the undisclosed modifications to the Commitment letter, the merger was never consummated—causing billions of dollars in damages to unsuspecting Huntsman and its shareholders.

92. After losing the Huntsman lawsuit in Delaware, Hexion, Apollo (Josh Harris and Leon Black, individually) and Hunstman settled the merger lawsuit for $1 billion on December 14, 2008.  Huntsman settled essentially for disparagement damages to the corporation itself given Hexion's weak balance sheet, along with its own due to the litigation and credit crisis. Huntsman shareholders did not participate financially in the settlement.

93. On June 23, 2009, Huntsman and the Banks settled the Conroe, Texas lawsuit during the trial for $1.7 billion (only $632 million was received in cash).   Huntsman's total proceeds from both the Hexion and the Banks settlements was only a small fraction of the damages it was seeking.  Shareholders in Huntsman, such as MatlinPatterson, did not participate in the settlements and it alone is seeking its own direct claims now against the Banks. Any remaining derivative claims by Huntsman shareholders against Banks have expired due to the statute of limitations.

94. The Banks' lead trial lawyer at the Conroe, Texas trial, Richard Clary, made the following argument to the jury to prove there were no secret side deals in connection with the merger financing:

> Now, let me speak very briefly in sort of overview what -- what they are saying here. They said there were secret side deals, secret side agreements, secret meetings. And I'm gonna walk through all those because the evidence is actually gonna show that there weren't any secret meetings.
>
> Huntsman was told about the meetings. And there aren't any secret agreements because the only things that actually became agreements were turned into formal amendments to the commitment letter. Huntsman was notified of them, was given copies of the address of the amendments, and their own general counsel, their own inside lawyers said, "Thank you and call the amendments progress -- progress on the transaction."
>
> Those are the only actual agreements, and they're not secret. Everything else that you heard described, that all the words from Apollo: "Trust me," "We'll work with you," "We'll take care of you," "Don't worry about that," okay, all of those you will hear Josh Harris say, constituted, "We'll -- we'll try and work with you. We'll think about it."
>
> And yet, the evidence will show that when the banks, in fact, then had some meetings and said, "Can you do this, can you do that to help the syndication?" The response was "No" because the only way to change the commitment letter was by formal amendment.
>
> So, the -- the so-called assurances, the so-called handshakes, you will hear the Apollo witnesses talk about them, they gave their depositions after they were agreeing to cooperate with Huntsman, and they're gonna say, "That meant we'll think about it." And they did think about it, and they said "No."

This argument completely contradicts the accounting treatment the Banks' utilized in marking-to-market the commitment letter losses during the fraud period. KPMG were the auditors for both Banks, and it has some explaining to do to the FRB, SEC, OCC and FFIEC.

95. The Banks' lawyers, Cravath, Swaine & Moore, issued a self-congratulatory press release:

> The terms of the settlement are far below the amounts Huntsman had sought at trial. Huntsman had asked the Texas jury to award $4.65 billion in compensatory damages plus another $9.3 billion in punitive damages. Under the terms of the settlement, Credit Suisse and Deutsche Bank will each pay $316 million in cash. In addition, the two banks will each provide $550 million of senior debt financing to Huntsman

International LLC, a subsidiary of Huntsman, to be repaid over seven years with interest. Under the settlement, Huntsman is recovering less than 14% of its claimed compensatory damages. Moreover, had the merger closed as scheduled in October 2008 and the banks provided the $15.35 billion of merger financing under their commitment letter, the banks' estimated mark-to-market losses on the financing at closing would have been approximately $4 billion per bank, or approximately $8 billion in total.

This was foolish because it admitted on the Banks' behalf the true extent of the mark-to-market losses, which both banks under recorded and reported during the periods they should have been recorded at actual fair value. Rather than recording and reporting at actual fair value, both banks mismarked the losses by billions of dollars and stopped recording and reporting them altogether in 2008. This was fraud, plain and simple.

## CAUSE OF ACTION

### *Violations of the False Claims Act*

96. Antonvich incorporates and re-alleges all of the foregoing allegations herein.

97. Based upon the acts described above, Defendants knowingly violated one or more of the following:

> a.   Knowingly presented, or caused to be presented, a false or fraudulent claim for payment or approval;

> b.   Knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government.

Under the FCA the term "claim" means "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property." 31 U.S.C. §3729(b)(2)(A). A claim can be presented to any recipient so long as the claimed money or property "is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government — (I)

provides, or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested." Id. at § 3729(b)(2)(A)(i) - (II).

98. The United States, unaware of the falsity of these claims, records, and statements made by the Defendants, and in reliance on the accuracy thereof, provided money and securities to the Defendants to fund their operations and to pay for the multi-billion dollar litigation settlements.

99. The United States and the general public have been damaged as a result of Defendants' violation of the False Claims Act.

## PRAYER

100. For the reasons set forth above, Antonvich, on behalf of the United States, respectfully requests this Court to find that Defendants have damaged the United States Government as a result of its conduct under the False Claims Act. Antonvich prays that judgment enter against Defendant for all applicable damages, including but not limited to the following:

      a.      Actual damages in the billions of dollars.

      b.      Civil Penalties in an amount of three times the actual damages suffered by the Government.

      c.      Relator seeks a fair and reasonable amount of any award for his contribution to the Government's investigation and recovery pursuant to 31 U.S.C. §§ 3730(b) and (d) of the False Claims Act.

      d.      Relator seeks a fair and reasonable amount of any award for his contribution to the Government's investigation and recovery pursuant to 31 U.S.C. § 3730(c)(5).

  e.  Attorney's fees and costs awarded to Relator.

  f.  Pre-judgment and post judgment interest.

  g.  All other relief on behalf of the Relator and/or United States Government

to which they may be entitled at law or equity.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this 14th day of February, 2014

Respectfully Submitted,

Mark S. Antonvich
1955 Vermont Street
Houston, Texas 77019
(281) 414-3866
mantonvich@aol.com

## CERTIFICATE OF SERVICE

I, Mark Antonvich, certify that a true and correct copy of the foregoing has been served on
the following parties this 14th day of February 2014:

Hon. Eric Holder
Attorney General of the United States
U.S. Dept. of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530-0001
(202) 514-2001

Hon. Preet Bharara
United States Attorney for the
Southern District of New York
86 Chambers Street
New York, NY 10007
(212) 637-2800